UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DC3 ENTERTAINMENT, LLC, a Washington
limited liability company,

       Plaintiff and Counterclaim Defendant,

       v.

JOHN GALT ENTERTAINMENT, INC., a
California corporation; DAVID
KERSHENBAUM and TIMMI DEROSA
KERSHENBAUM, husband and wife and the
marital community composed thereof,

       Defendants and Counterclaim Plaintiffs.
_____

JOHN GALT ENTERTAINMENT, INC., a
California corporation; DAVID
KERSHENBAUM and TIMMI DEROSA
KERSHENBAUM, husband and wife and the
marital community composed thereof,

       Third-Party Plaintiffs,

       v.

JONATHAN PHELPS and ESTHER PHELPS,
husband and wife and the marital community
composed thereof,

       Third-Party Defendants.

CASE NO. C04-2374C

ORDER

ORDER – 1

1

**INTRODUCTION**

2         This matter comes before the Court on Plaintiff's and Third-Party Defendants' (Partial) Motion

3   for Summary Judgment on Defendants' Contract Counterclaims and Third-Party Plaintiff Claims (Dkt.

4   No. 178) ("Pl.'s Mot."), Defendants' and Third-Party Claimants' Opposition (Dkt. No. 226) ("Defs.'

5   Opp'n"), and Plaintiff's and Third-Party Defendants' Reply in support of their motion (Dkt. No. 232)

6   ("Pl.'s Reply").  The Court has considered all of the papers submitted regarding this motion and

7   determined that oral argument is not necessary.  The Court hereby GRANTS IN PART and DENIES IN

8   PART the motion and rules as follows.

9

**TABLE OF CONTENTS**

10

**I. BACKGROUND AND FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **3**
11            **A.  The Parties.** . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . .. . . . . . .   **4**
            **B.  The Agreements.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **5**
12                  **1.  The John Galt–Judah Production Agreement** . . . . . . . . . . . . . . . . . . . . .   **5**
                  **2.  A Second John Galt–Judah Agreement?.** . . . . . . . . . . . . . . . . . . . . . . .   **7**
13                  **3.  The John Galt–DC3 Assignment** . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **8**
                  **4.  The DC3–Judah Recording and Production Agreement.** . . . . . . . . . . . . . .   **10**
14                  **5.  The John Galt–DC3 Development Agreement.** . . . . . . . . . . . . . . . . . . . . .   **11**
                  **6.  The DC3 Co-president Agreement.** . . . . . . . . . . . . . . . . . . . . . . . . . . .   **12**
15            **C.  Motion for Summary Judgment on Contract Counterclaims and**
                  **Third-Party Claims.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **12**
16
      **II.  APPLICABLE STANDARD.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . .   **14**
17
      **III.  CHOICE OF LAW.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **15**
18
      **IV.  ANALYSIS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . .   **16**
19            **A.  Standing of Ms. Kershenbaum.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **16**
            **B.  The John Galt–DC3 Assignment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **17**
20            **C.  An Analogous Implied-in-Fact Contract?** . . . . . . . . . . . . . . . . . . . . . . . .   **26**
            **D.  Enforceability of an Implied-in-Fact Contract.** . . . . . . . . . . . . . . . . . . . . . .   **31**
21            **E.  Accounting and Constructive Trust Counterclaims and Third-Party Claims.** . . . .   **35**

22   **V.  CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   **36**

      *//*
23
      *//*
24
      *//*
25

26   ORDER – 2

## I.      BACKGROUND AND FACTS

The underlying dispute concerns a series of agreements related to the development of a debut album by recording artist Brian Judah ("Mr. Judah"), as well as the business relationship between the parties.  Plaintiff's First Amended and Supplemental Complaint (Dkt. No. 14) alleged claims for declaratory judgment, breach of contract, breach of a covenant of good faith and fair dealing, breach of fiduciary duty, and injunctive relief in connection with Plaintiff's relationship with Defendants, particularly David Kershenbaum and Timmi DeRosa Kershenbaum.  Defendants counterclaimed for breach of contract, an accounting of royalties, establishment of a constructive trust, discrimination, harassment, retaliation, and wrongful termination; they also claimed against Third-Party Defendants for an accounting of royalties, establishment of a constructive trust, harassment, and retaliation.  (Defs.' Counterclaims (Dkt. No. 18).)

On December 8, 2005, this Court granted Plaintiff's and Third-Party Defendants' motion for leave to file a Second Amended Complaint and First Amended Answer to Defendants' Counterclaims and Third-Party Claims.  (*See* Order (Dkt. No. 222); Second Amended Complaint (Dkt. No. 224); Plaintiff's and Third-Party Defendants' First Amended Answer (Dkt. No. 223).)  The Second Amended Complaint and First Amended Answer incorporated claims and defenses based on the possibility that one of the parties' agreements—an assignment of Defendants' contract rights with Mr. Judah to Plaintiff—was voidable.  Plaintiff and Third-Party Defendants thus added claims for rescission, intentional misrepresentation, and negligent misrepresentation.  To support these amendments, Plaintiff and Third Party-Defendants argued that the contract rights that Plaintiff had been "assigned" by Defendants were expired, and therefore could not be assigned in the first instance.  Such an expiration would render the assignment voidable and unenforceable and, in turn, also be a basis to rescind another of the parties' agreements—an oral services contract.

At issue on the instant motion are Defendants' contract counterclaims and third-party claims. Specifically, Defendants and Counterclaim Plaintiffs John Galt Entertainment, David Kershenbaum, and

ORDER – 3

Timmi DeRosa Kershenbaum seek damages for breach of contract against Plaintiff and Counterclaim Defendant DC3.  Defendants and Counterclaim Plaintiffs John Galt Entertainment and David Kershenbaum also seek an accounting and establishment of a constructive trust against Plaintiff and Counterclaim Defendant DC3.  Finally, Defendants and Third-Party Plaintiffs John Galt Entertainment and David Kershenbaum seek an accounting and establishment of a constructive trust against Third-Party Defendants Jonathan Phelps and Esther Phelps.[1]

**A. The Parties**

Mr. Kershenbaum is a record producer with a 30-plus-year career in the music industry who has worked with such well-known artists as Joe Jackson, Duran Duran, Kenny Loggins, Bryan Adams, Janet Jackson, Tori Amos, Joan Baez, Peter Frampton, Cat Stevens, and Tracy Chapman.  Ms. Kershenbaum is a songwriter and seminar teacher for aspiring songwriters who was married to Mr. Kershenbaum until their October 11, 2005 divorce.  The Kershenbaums are residents of California.  Together they own John Galt, a music production and entertainment company with its principal place of business in Bel Air, California.  The Kershenbaums were the sole owners and employees of John Galt when the facts giving rise to this lawsuit occurred.

Jonathan Phelps and Esther Phelps are husband and wife and are residents of Washington.  They own multiple businesses, one of which is DC3, an entertainment company formed in Washington with a principal place of business in Seattle, Washington.[2]  The Phelpses are the sole owners of DC3, which is

---

[1]  For clarity, the various parties and combinations thereof will be referred to as "DC3," "Mr. Phelps," "Ms. Phelps," "the Phelpses," "John Galt," "Mr. Kershenbaum," "Ms. Kershenbaum," or "the Kershenbaums," rather than by their various designations as Plaintiffs, Defendants, and Counterclaim or Third-Party Plaintiffs and Defendants.  The Court acknowledges that the Kershenbaums are now divorced and that Ms. Kershenbaum has changed her name from Timmi DeRosa Kershenbaum to Timmi DeRosa.  (*See* Pl.'s Mot., Lay Decl. Ex. 39 (Kershenbaum dissolution papers).)  However, for simplicity, the Court will refer to her as "Ms. Kershenbaum" despite her recent name change.

[2]  DC-3 LLLP, a Florida limited liability limited partnership, was the original Plaintiff in this action.  However, this Court granted a substitution of DC3 LLC, a Washington limited liability company, for DC-3 LLLP, making DC3 LLC the new Plaintiff and a Counterclaim Defendant.  (Order (Dkt. No. 74).)  Prior to the creation of DC3 LLC in Washington, the Florida partnership was involved in both the

ORDER – 4

1    both a business and a "ministry."  (Pl.'s Mot., Lay Decl. Ex. 9 (Dep. of Mr. Phelps) 77:2–4.)  The

2    "ministry"—or "motto"—of DC3 is "[f]looding the heart of darkness with the light of Jesus."  (Pl.'s

3    Mot., Lay Decl. Ex.11 (Dep. of Ms. Phelps) 65:18–21, 67:22–24.)  The Phelpses also own a recording

4    studio called "Sonic Temple," which is located in Ferndale, California.

5         The Phelpses and the Kershenbaums met each other in May and early June 2003.  Mr. Phelps had

6    successfully bid on an eBay auction for a three-day seminar with Mr. Kershenbaum that was to take place

7    in May 2003 at the Kershenbaums' home.  On the second or third day of the seminar, the Kershenbaums

8    introduced Mr. Phelps to Mr. Judah, a new recording artist with whom the Kershenbaums had been

9    working.  Mr. Judah performed for Mr. Phelps, who was "very impressed" with Mr. Judah.  Mr. Phelps

10   invited the Kershenbaums to join the Phelpses at their Ferndale, California ranch in early June 2003 for a

11   retreat with the Phelpses and some other of their friends.  The Kershenbaums attended.  During the

12   retreat, the Phelpses and the Kershenbaums began discussing their mutual desire to work together,

13   particularly in producing Mr. Judah.  Mr. Phelps was interested in signing Mr. Judah as DC3's first artist,

14   and Ms. Kershenbaum felt that God was "telling" her to sign over John Galt's contract with Mr. Judah to

15   DC3.

16   **B. The Agreements**

17        Several contracts and agreements are relevant to the instant motion for summary judgment.

18   These include contracts and agreements between John Galt and Mr. Judah, between John Galt and DC3,

19   between the Kershenbaums and DC3, and between DC3 and Mr. Judah.

20        **1. The John Galt–Judah Production Agreement**

21        The first of these agreements is between John Galt and Mr. Judah.  On or about May 8, 2002,

22   John Galt executed a 9-page "Production Agreement" with Mr. Judah, dated as of May 1, 2002.  It is in

23

24   ───────────────────

25   flight and media businesses; apparently now, however, DC-3 LLLP is a "flight company" that owns jets,
     whereas DC3 LLC is a "media company" that owns media interests.  (*See* Pl.'s Reply in Support of
     Motion for Substitution of Parties (Dkt. No. 69).)

26   ORDER – 5

1    the form of a letter signed by Mr. Judah and by Mr. Kershenbaum for John Galt.  One of the material

2    terms is an initial "shopping"[3] period that would expire upon the earlier of (1) 10-and-a-half months

3    following the date of the contract; or (2) the date upon which John Galt entered into a "Distribution

4    Agreement."  (Pl.'s Mot., Lay Decl. Ex. 14 (Judah Decl. (filed in support of Pl.'s Mot. to Amend) Ex. 1

5    ("Production Agreement")) 2 [hereinafter "John Galt–Judah Production Agreement"].)  Further, in the

6    event that John Galt had "substantially negotiated the material provisions of a Distribution Agreement,

7    but [had] not entered into such agreement upon the date when the initial period would otherwise expire,"

8    the initial "shopping" period could be extended for 90 days from the expiration date.  (*Id.* at 2–3.)  It is

9    undisputed that John Galt did *not* enter into or substantially negotiate a Distribution Agreement prior to

10   Mr. Judah signing his contract with DC3 (Pl.'s Mot., Lay Decl. Ex. 7 (Dep. of John Galt) 174:4–8), so

11   the Distribution Agreement extensions were not triggered in this case.

12        The John Galt–Judah Production Agreement specifies that if John Galt were *not* to enter into a

13   "Distribution Agreement" or substantially negotiate the same, the "shopping" term would "automatically

14   terminate upon the expiration of the initial period," with no extension.  (John Galt–Judah Production

15   Agreement 3.)  Upon such a termination, the parties would have "no further obligations towards one

16   another."  (*Id.*)  Thus, based on the agreement's apparent execution date of May 1, 2002, the default

17   expiration date of the contract would have been 10-and-a-half months later, or March 15, 2003.

18   However, securing a Distribution Agreement was not the only way to extend the contract's duration and

19

20          [3] To "shop" a production agreement in the music industry is to seek a distribution agreement—or

21   record deal—with a distributor.  (*See* Pl.'s Mot., Lay Decl. Ex. 7 (Dep. of Ms. Kershenbaum as the
     person most knowledgeable of John Galt Entertainment) 176:14, 177–78 [hereinafter Dep. of John Galt];

22   *see also* Pl.'s Mot., Lay Decl. Ex. 5 (Dep. of Mr. Kershenbaum) 348:16–23 (explaining a production
     contract's purpose of giving rights to a producer to allow that producer to "transfer" a contract to a

23   "major label").)  A "shopping" period typically is limited, as here, to a finite period, after the expiration of
     which the artist is no longer under contract.  (*See id.* at 178:11–14; Pl.'s Mot., Lay Decl. Ex. 6 (Dep. of

24   Mr. Kershenbaum) 172:19–24.)  However, a "shopping" period may be extended or followed up by
     additional such periods while the artist remains under contract.  (*E.g., id.* at 179 (referring to "the end of

25   the first shopping"); *id.* at 185 (referring to a "suspension" that can extend a time-limited contract,
     rendering the "contract time" "frozen").)

26   ORDER – 6

avoid a March 15, 2003 termination of contract obligations.  The John Galt–Judah Production Agreement states, in relevant part, that John Galt and Mr. Judah

> shall negotiate in good faith and shall enter into a more formal agreement as is necessary to effectuate the intention of the parties hereto.  This agreement may be executed in counterparts.  Until such time (if ever) as such agreements are entered into, this agreement is intended to be the sole and exclusive binding agreement between the parties setting forth the entire understanding of the parties hereto relating to the subject matter hereof and superseding all or contemporaneous agreements, negotiations, promises, representations, understandings and/or discussions whether oral or written, pertaining thereto.  No modification, amendment, waiver, termination nor discharge of this Agreement or of any of the terms or provisions hereof shall be binding upon either party hereto unless confirmed by a written instruction signed by [Mr. Judah] and an authorized representative of [John Galt].  This agreement shall be legally binding upon the parties hereto and shall be construed in accordance with and governed by the laws of the State of California applicable to agreements entered into and to be wholly performed herein.

(*Id.* 8–9.)  Thus, the plain language of the John Galt–Judah Production Agreement shows that the parties to it contemplated making subsequent agreements and that any subsequent agreements altering its terms would have to be "confirmed" in a writing signed by the parties.  However, whether any such subsequent written agreements actually were made is a question of fact that is central to the instant motion for summary judgment.

## 2. A Second John Galt–Judah Agreement?

The Kershenbaums and John Galt maintain that there was another "supplemental" agreement that both extended the finite term of the John Galt–Judah Production Agreement and provided for a "suspension" option that was later utilized, further extending the finite contract term.  This second agreement is alleged to have been executed on June 20, 2002.  No original or copy of such a supplemental agreement has been produced in this litigation, but the Kershenbaums and John Galt insist that they can prove its contents, in part by reference to an almost-identical "Recording and Production Agreement" between DC3 and Mr. Judah (*see infra* subsection I.B.4).  The Kershenbaums and John Galt allege that the one and only original (or copy) of the June 20, 2002 agreement between John Galt and Mr. Judah is in the possession of Mr. Phelps.  Conversely, the Phelpses and DC3 contend that there was no such supplemental (or second) agreement and that the (first) May 1, 2002 John Galt–Judah Production

ORDER – 7

1    Agreement is the *only* agreement made between John Galt and Mr. Judah.

2        The term of the alleged second agreement was to have been 45 days longer than the first

3    agreement, with a first-term termination date of April 30, 2003 (whereas the John Galt–Judah Production

4    Agreement's expiration date was March 15, 2003 (*see supra* subsection I.B.1)).  (Defs.' Opp'n,

5    Kershenbaum Decl. 6 (¶ 17).)  Further, John Galt and the Kershenbaums claim that the alleged second

6    contract's "suspension and termination" clause was invoked.  (*Id.*)  There is in evidence a suspension

7    letter, dated January 9, 2003 and sent from the Kershenbaums for John Galt to Mr. Judah.  (Pl.'s Mot.,

8    Lay Decl. Ex. 14 (Judah Decl. (filed in support of Pl.'s Mot. to Amend) Ex. 2 (January 9, 2003 letter))

9    [hereinafter "Suspension Letter"].)  Rather unhelpful to determining whether a second agreement existed,

10   the suspension letter purports to invoke the terms of the parties' "agreement" "dated: 2002"—thus failing

11   to distinguish between the first and alleged second agreements, both of which were executed in 2002.

12   According to Ms. Kershenbaum, Mr. Judah's suspension lasted 119 days, until May 8, 2003 "when Mr.

13   Judah went back to work in the studio."  (Defs.' Opp'n, Kershenbaum Decl. 6 (¶ 17).)  Apparently, when

14   the suspension was over, the clock on the agreement containing the suspension clause resumed ticking.

15   Thus, as a result of the 119-day suspension, if there was a second contract it would have expired 119

16   days after its April 30, 2003 termination date.  This is critical, because the second contract still would

17   have been in effect on July 8, 2003 when the John Galt–DC3 Assignment was executed (*i.e.,* John Galt

18   would have had contract rights to assign at that time).

19       **3. The John Galt–DC3 Assignment**

20       The third agreement involves one between John Galt and DC3.  Its meaning and enforceability are

21   in dispute as well.  Following the Kershenbaums' and the Phelpses' mutual decision to work together,

22   they executed a 2-page agreement entitled "Assignment of All Rights Re: Production Agreement of Brian

23   Judah."  (Pl.'s Mot., Lay Decl. Ex. 13 (Phelps Decl. (filed in support of Pl.'s Mot. to Amend) Ex. 1

24   ("Assignment of All Rights Re: Production Agreement of Brian Judah")) [hereinafter "John Galt–DC3

25   Assignment"].)  The specific terms of the John Galt–DC3 Assignment follow.  Because the agreement is

26   ORDER – 8

short and a determination of the meaning of its terms is central to resolving the instant motion, the agreement is reproduced in its entirety herein:

ASSIGNMENT OF ALL RIGHTS RE: PRODUCTION AGREEMENT OF BRIAN JUDAH

For the total sum and consideration of Thirty Thousand Dollars ($30,000) hereinafter known as agreed upon and acceptable hard cost reimbursements, John Galt Entertainment, Inc. hereby transfers all rights of it's [sic] Production Agreement dated May 1, 2002 for the recording Artist Brian Judah to DC3/Entertainment/Sonic Temple Records.

In addition to the above consideration, DC3 Entertainment Inc[.] and Jon and Esther Phelps guarantee to John Galt Entertainment Inc[.] that they singularly or collectively will hire David Kershenbaum to solely produce Brian Judah's 1st album, currently entitled "Garden of Edith".  DC3 Entertainment Inc[.], Sonic Temple Records and or Jon and Esther Phelps will pay John Galt Entertainment Inc[.] a one hundred thousand dollar advance ($100,000) and a four point retail worldwide royalty override for David's services on Brian Judah's Album after recoupement [sic] of the approved budget for production costs.

The hundred thousand dollar ($100,000) producer advance will be paid in the following manner then [sic] Fifty thousand dollars ($50,000) upon starting the record, twenty five thousand dollars ($25,000) upon the start of mixing, and the additional ($25,000) upon delivery of the masters to the company.

The producer points paid to John Galt Entertainment Inc[.] will be recouped at the combined royalty rate of the producer and artist and will be paid retroactively from record one, after recoupement [sic].  In addition John Galt Entertainment Inc[.] will receive a 1/2 % retail worldwide royalty 1/2% point bump at Gold and an additional retail worldwide 1/2% point bump at platinum will go in affect [sic] at the achieved level but will not be retroactive.

Sonic Temple or DC3 Entertainment LLC will pay all of Producer's expenses related to food, lodging and travel in connection with the Brian Judah Album.

Album credit will read produced by David Kershenbaum for John Galt Entertainment, Inc.

On this day July 8th, 2003, and upon the signatures of DC3 Entertainment LLC, and Brian Judah's signature on what is known as the Recording and Production Agreement, John Galt Entertainment Inc[.] assigns and transfers all of it's [sic] rights that it received in the production agreement dated May 1, 2002, to the Corporation currently known as DC3 Entertainment LLC.

In this transfer, on this day, the Recording and Production Agreement by and between Brian Judah and DC3 Entertainment LLC, supercedes [sic] any and all written, verbal, and or any other rights known or unknown, real or imaginary, throughout the entire Universe that John Galt Entertainment Inc[.] and any of it's [sic] officers, employees, delegates, and or associates can make claims to.

ORDER – 9

This agreement in no way deals with any publishing rights, as John Galt Entertainment Inc[.] makes no claim to Brian's publishing and any and all publishing rights that John Galt Entertainment, Inc. Timmi DeRosa Kershenbaum or David Kershenbaum owns [*sic*] remains [*sic*] their property for the purpose of this agreement.

(*Id.*)  The John Galt–DC3 Assignment was dated July 8, 2003 and signed by Mr. Phelps as "Chairmen [*sic*] DC3 Entertainment [I]nc." and by Ms. Kershenbaum as "President of John Galt Entertainment Inc." and Mr. Kershenbaum as "Producer."  (*Id.* at 2.)  The Phelpses' and DC3's contention that the John Galt–Judah Production Agreement was expired (*i.e.*, it was not extended or supplemented) before John Galt assigned its rights to DC3 is the basis for their summary judgment argument that the above "assignment" is voidable and therefore that the Kershenbaums and John Galt cannot seek damages for the assignment's breach.

### 4.  The DC3–Judah Recording and Production Agreement

The fourth agreement, which is specifically referenced in the John Galt–DC3 Assignment reproduced *supra* subsection I.B.3, is a "Recording and Production Agreement" between DC3 and Mr. Judah.  (Pl.'s Mot., Lay Decl. Ex. 13 (Phelps Decl. (filed in support of Pl.'s Mot. to Amend) Ex. 2 ("Recording & Production Agreement")) [hereinafter "DC3–Judah Recording and Production Agreement"].)  This agreement is a 27-page contract.  It is dated July 8, 2003 and was signed by Mr. Phelps for DC3 and by Mr. Judah.  Significant terms of the DC3–Judah Recording and Production Agreement include the following: (1) a provision that the "term" of the contract would be the "initial" or "first" contract period plus "additional" contract periods, available at DC3's option (*id.* at 1); (2) expiration dates for the "first" contract period[4] and subsequent contract periods (*id.*); (3) a requirement to record "master" recordings for use in securing "one or more Distribution Agreements" (*id.* at 2); (4) a

---

[4]  The first contract period started on the contract date and was set to end on the latter of (a) 10 months after delivery to DC3 of the "last Master Recordings that are required to be delivered hereunder in fulfillment of the Minimum Recording Commitment" during the first contract period; or (b) 7 months after the initial commercial release in the United States of the "Album required to be delivered hereunder in fulfillment of the Minimum Recording Commitment" during the first contract period.  (DC3–Judah Recording and Production Agreement 1.)

ORDER – 10

provision that if no Distribution Agreement is entered into within 1 year of the agreement, Mr. Judah could terminate the contract by providing written notice within 30 days of the expiration of that year (*id.*); (5) a "selection" of David Kershenbaum to be the producer of "Album 1, entitled Garden Of Edith" (*id.* at 4); (6) a recording location selection of the Phelpses' Sonic Temple studio in Ferndale, California (*id.* at 4–5); (7) a provision that Mr. Judah "retains his own publishing" rights, titles, and interests (*id.* at 5–6); (8) a "suspension and termination" clause allowing DC3 to terminate or extend the contract term if, among other things, Mr. Judah's voice or ability were to become materially impaired or if he failed, refused, neglected, or was unable to perform his contract obligations (*id.* at 16–17); and various other provisions regarding the contract term, recording services to be provided, Mr. Judah's recording commitment, the recording procedures and costs, transfers of rights, advances, royalties, accountings, warranties, definitions, licensing, relief available, assignments, notices, breach, and other terms.

Again, also significant to the instant motion is that the Kershenbaums and John Galt assert that this DC3–Judah Recording and Production Agreement is "identical in all its terms[,] with the exception of the parties[] and consideration terms," to the June 20, 2002 "extension" or "supplemental contract" that John Galt allegedly executed with Mr. Judah (*i.e.*, the second agreement described *supra* subsection I.B.2 is practically identical to this fourth agreement).

### 5. The John Galt–DC3 Development Agreement

Finally, the Kershenbaums entered into two additional agreements with DC3—the fifth and sixth agreements in the series described herein. The fifth agreement was made on July 8, 2003—the same date as the John Galt–DC3 Assignment and the DC3–Judah Recording and Production Agreement—wherein DC3 agreed to pay John Galt an additional $50,000 in return for Ms. Kershenbaum's "development" of Mr. Judah (hereinafter "John Galt–DC3 Development Agreement"). Following this oral agreement, payment was made in two $25,000 installments. (Pl.'s Mot., Lay Decl. Ex. 18.) Payment under this contract was made apparently via two checks issued by Phelps Enterprises, LLC to John Galt—one on July 14, 2003 and the other on August 14, 2003—and an invoice describing the payments as a "[f]lat

1   non-recoupable development fee—Brian Judah.  Development will commence immediately and will run

2   until executive producer Jon Phelps approves all songs for upcoming album.  Payable 1/2 upon receipt of

3   invoice and 1/2 upon completion of development."  (*Id.*)

4      **6.  The DC3 Co-president Agreement**

5      Pursuant to the agreements described *supra*, production of the Judah album began in early

6   September 2003 at the Ferndale, California recording studio, with Mr. Kershenbaum acting as producer.

7   Then, in early October 2003, another agreement was made—the sixth in the series described herein.  This

8   agreement was an oral services contract between John Galt and/or the Kershenbaums and DC3.  DC3 and

9   the Phelpses characterize it as a replacement of the John Galt—DC3 Assignment, whereas the

10  Kershenbaums and John Galt characterize it as an employment agreement wherein the Kershenbaums

11  became employees of DC3.[5]  Regardless of its nature (which the Court does not decide at this time), it is

12  undisputed that this oral agreement made the Kershenbaums "co-presidents" of DC3, for which they

13  (and/or John Galt) received an annual "salary" of $1 million (hereinafter "DC3 Co-president

14  Agreement").  The Kershenbaums' work with (or for) DC3 continued for one year, until the parties'

15  professional relationship ended (by termination or resignation) in October 2004.

16  **C.  Motion for Summary Judgment on Contract Counterclaims and Third-Party Claims**

17     Although John Galt and the Kershenbaums have brought employment counterclaims based on the

18  series of agreements described above, only their *contract* claims are at issue in the instant motion for

19  summary judgment.  Specifically, DC3 and the Phelpses seek dismissal of counterclaims and third-party

20  claims for breach of contract, accounting of royalties, and establishment of a constructive trust.

21     In their counterclaims, the Kershenbaums and John Galt allege that DC3 breached the John

22  Galt–DC3 Assignment, set forth *supra* subsection I.B.3.  That single agreement is the subject of DC3's

23

24  ───────────────

25     [5]  In its May 20, 2005 Order (Dkt. No. 71), this Court found that there is a genuine issue of
    material fact regarding the characterization of the October 2003 agreement and that summary judgment is
    not appropriate on the issue of whether that agreement was a contract by novation.

26  ORDER – 12

and the Phelpses' motion for summary judgment on contract counterclaims.  Under the terms of the John Galt–DC3 Assignment, John Galt was owed $30,000 for cost reimbursements; John Galt was guaranteed that DC3 and/or the Phelpses would hire Mr. Kershenbaum to "solely produce" Mr. Judah's first album; and DC3, the Phelpses, and/or Sonic Temple Records agreed to pay a $100,000 advance ($50,000 upon starting the record, $25,000 upon the start of mixing, and $25,000 upon delivery of the masters to the company) and a "four point retail worldwide royalty override" (with additional royalties for gold (1/2 %) and platinum (1/2 %)) for Mr. Kershenbaum's producer services.  (John Galt–DC3 Assignment 1.)

Performance under the John Galt–DC3 Assignment occurred as follows.  As discussed *infra*, it is unclear whether John Galt performed the transfer of contract rights contemplated by the parties.  However, it is undisputed that DC3 did pay the $30,000 cost reimbursement to John Galt on July 9, 2003.  (Pl.'s Mot., Lay Decl. Ex. 17 (invoice and check for expense reimbursement).)  Further, the first $50,000 producer advance installment was paid to John Galt on July 28, 2003.  (*Id.* (invoice and check for half of the producer advance).)  Mr. Kershenbaum began producing Mr. Judah's album in September 2003 and continued in this role until the parties' relationship ended in September 2004, and he completed 9 tracks, along with work on rough mixes of 18 other tracks.  (Defs.' Counterclaims (Dkt. No. 18) 12.) The remaining $50,000 of the producer advance was never paid.  Further, no royalties have been paid, because the album remains incomplete.  John Galt and the Kershenbaums claim that in addition to these unpaid amounts, they have lost follow-up work due to lost name-recognition and royalties due to an inferior product being produced without Mr. Kershenbaum.  They believe their damages to be in excess of $10 million.  (*See id.* at 11–14.)

DC3's position is that Mr. Kershenbaum's work was unsatisfactory.  In December 2004, DC3 and Mr. Judah began working on the album again without Mr. Kershenbaum, and DC3 asserts that it will not include any work product of Mr. Kershenbaum in the final album.  In addition to their claims for breach by nonpayment, John Galt and the Kershenbaums claim that this ongoing work on Mr. Judah's album

ORDER – 13

without Mr. Kershenbaum is a further breach of the John Galt–DC3 Assignment.[6]  Beyond its position

that Mr. Kershenbaum's performance was unsatisfactory, DC3 asserts that it has a complete defense

against any claims for breach by John Galt or the Kershenbaums because the John Galt–DC3 Assignment

is voidable.  (*See* Pl.'s Mot.; Second Amended Complaint (Dkt. No. 224).)  DC3 and the Phelpses argue

that the John Galt–DC3 Assignment is voidable because the Kershenbaums and John Galt had no rights

to assign at the time the agreement was executed but misrepresented that they did have such rights.

Related to this theory, DC3 makes claims for intentional misrepresentation and negligent

misrepresentation in its Second Amended Complaint, and thereby seeks rescission of the allegedly

voidable contract as an offensive remedy.  DC3 and the Phelpses also challenge Ms. Kershenbaum's

standing to bring any contract-related claims against them.

## II.   APPLICABLE STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and

provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

a matter of law."  FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the Court must

view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences

in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*,

84 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient

evidence for a reasonable fact-finder to find for the non-moving party.  *Anderson*, 477 U.S. at 248.  The

inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

---

[6]  This Court previously refused to grant summary judgment in favor of DC3 on the issue of whether Mr. Kershenbaum has any enforceable rights under the John Galt–DC3 Assignment.  (Order (Dkt. No. 71).)  However, the Court did determine that if the John Galt–DC3 Assignment is enforceable, the Kershenbaums and John Galt cannot enforce the sole producer guarantee by specific performance.  (*Id.*)

ORDER – 14

1    whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving

2    party bears the burden of showing that there is no evidence which supports an element essential to the

3    non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this

4    burden, the non-moving party then must show that there is in fact a genuine issue for trial. *Anderson*,

5    477 U.S. at 250.

6    **III.   CHOICE OF LAW**

7            State law governs diversity cases. *See generally*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

8    Because there is no choice-of-law clause in the John Galt–DC3 Assignment, the Court must decide which

9    state's law applies to this dispute. For the following reasons, the Court finds that California law applies

10   to the instant issues of whether John Galt and the Kershenbaums can proceed with their claims for breach

11   of the John Galt–DC3 Assignment and whether that agreement is voidable.

12           Federal district courts must apply the choice-of-law rules of the state where the federal court sits.

13   *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Washington courts apply the choice-of-law

14   analysis set out in the *Restatement (Second) of Conflicts*. *Fluke Corp. v. Hartford Accident & Indem.*

15   *Co.*, 34 P.3d 809, 815 (Wash. 2001). Accordingly, Washington courts will not engage in a conflicts

16   analysis unless the party asserting the law of a foreign jurisdiction first shows that the law of that

17   jurisdiction is fundamentally incompatible. *Burnside v. Simpson Paper Co.*, 864 P.2d 937, 941 (Wash.

18   1994). In the instant motion, DC3 and the Phelpses note that there "does not appear to be a dispute

19   regarding the application of California law" to the John Galt–DC3 Assignment and disputes arising out of

20   it. (Pl.'s Mot. 6–7 n.4.) John Galt and the Kershenbaums do not address the choice-of-law issue in their

21   opposition to the motion, nor do they dispute DC3's and the Phelpses' statement about there being no

22   conflict. Further, both parties rely on California law in making their arguments. Because the requisite

23   allegation of incompatibility has not been made by any party, because no party asserts that any state's law

24   other than California's applies, and because both parties rely exclusively on California law, this Court

25   need not conduct a choice-of-law analysis.

26   ORDER – 15

1    Moreover, the parties' forum selection in related contracts is an additional factor favoring the

2    application of California law to the instant dispute.  Both the John Galt–Judah Production Agreement and

3    the DC3–Judah Recording and Production Agreement do have California choice-of-law clauses.  The

4    choice of California law in the John Galt–Judah Production Agreement is significant because DC3 and the

5    Phelpses claim that it is the *only* contract between John Galt and Mr. Judah and that it alone was the

6    contract that John Galt attempted to assign to DC3.  Further, the choice of California law in the

7    DC3–Judah Recording and Production Agreement is significant both because that contract is specifically

8    mentioned in the John Galt–DC3 Assignment and because John Galt and the Kershenbaums claim that the

9    DC3–Judah Recording and Production Agreement is almost identical to their alleged second contract

10   with Mr. Judah that extended their rights beyond those that they had acquired through their first contract

11   with him.  Thus, the Court finds application of California law to be proper on the issues of whether John

12   Galt and the Kershenbaums can proceed with their claims for breach of the John Galt–DC3 Assignment

13   and whether that agreement is voidable.   However, this finding is not determinative of which state's law

14   applies to other disputes in this case.

15   **IV.   ANALYSIS**

16   **A. Standing of Ms. Kershenbaum**

17      The Court finds that Ms. Kershenbaum is *not* a real party in interest to the instant dispute over the

18   John Galt–DC3 Assignment and related agreements, as the only parties to the John Galt–DC3

19   Assignment were John Galt, DC3, and Mr. Kershenbaum.  Neither is Ms. Kershenbaum an intended

20   third-party beneficiary under the contract.  A third party who is an incidental beneficiary of an agreement

21   has no standing to enforce the contractual obligations of that agreement, absent language expressly

22   conferring a benefit to that third party.  *Martinez v. Socoma Cos.*, 11 Cal. 3d 394, 398 (1974).   Although

23   the John Galt–DC3 Assignment does entitle Ms. Kershenbaum to receive a benefit in the form of royalty

24   payments, her entitlement to these royalties is but an incident of the rights of John Galt as a real party in

25   interest to the John Galt–DC3 Assignment.  Accordingly, the Court finds Defendant Timmi DeRosa

26   ORDER – 16

1    Kershenbaum is without standing to bring a counterclaim for breach of the John Galt–DC3 Assignment.

2       The Court notes that despite this finding the Ms. Kershenbaum does not have standing to sue for

3    breach of the John Galt–DC3 Assignment, the discussion herein about relevant facts, claims, and defenses

4    on the instant motion will include references to Ms. Kershenbaum as a party who has made arguments or

5    asserted legal or factual positions.

6    **B.  The John Galt–DC3 Assignment**

7       DC3 and the Phelpses argue that John Galt and the Kershenbaums' "fraudulent

8    misrepresentation" renders the John Galt–DC3 Assignment voidable, and in turn, that this voidability is a

9    complete defense to John Galt and the Kershenbaums' claims for breach of the John Galt–DC3

10   Assignment.  Underpinning this argument is the assertion that John Galt's rights to produce Mr. Judah's

11   album were expired by the time the John Galt–DC3 Assignment was executed.  DC3 and the Phelpses

12   further argue that the "clear, unambiguous" language of the John Galt–DC3 Assignment shows that John

13   Galt purported to assign rights that it did not have.  In response, John Galt and the Kershenbaums argue

14   that they had another (second) contract with Mr. Judah that supplemented the first contract and extended

15   their rights, such that they *did* have rights at the time of the John Galt–DC3 Assignment.  They refute the

16   voidability argument by arguing that Mr. Phelps did not read the contract he signed and that the instant

17   assertion of voidability is untimely.  However, for the first time in this litigation, John Galt and the

18   Kershenbaums bring forth the additional argument that the John Galt–DC3 Assignment was not really an

19   assignment after all.  Rather, they argue, the use of the term "assignment" was a misnomer that should be

20   disregarded by the Court, and the John Galt–DC3 Assignment was really a new "contract" with different

21   terms.

22      In order to meet their burden on summary judgment, DC3 and the Phelpses must show that the

23   Kershenbaums cannot sue for breach of the John Galt–DC3 Assignment or any agreement with like

24   terms.  To do so on the theories they advance, they must show either (1) that any assignment (or contract

25   formation) failed and therefore that the John Galt–DC3 Assignment (or any similar agreement) is

26   ORDER – 17

1  unenforceable; or (2) that *if* an assignment was effective or a contract *was* formed, there nevertheless was

2  a misrepresentation by John Galt that renders the contract or assignment voidable at DC3's option *and*

3  that DC3 did not ratify the contract and render it enforceable despite its voidability.

4      Because its meaning and enforceability is disputed, the Court begins with the language of the John

5  Galt–DC3 Assignment (which is reproduced in full *supra* subsection I.B.3).  The California Civil Code

6  provides that a contract "must be so interpreted as to give effect to the mutual intention of the parties as

7  it existed at the time of contracting, so far as the same is ascertainable and lawful."  CAL. CIV. CODE §

8  1636 (West 2006).  Further, the "language of a contract is to govern its interpretation, if the language is

9  clear and explicit, and does not involve an absurdity."  *Id.* § 1638.  However, if there is ambiguous

10  language in the contract, different rules apply.  "If the terms of a promise are in any respect ambiguous or

11  uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that

12  the promisee understood it."  *Id.* § 1649.  Further, "parol evidence is properly admitted to construe a

13  written instrument when its language is ambiguous.  The test of whether parol evidence is admissible to

14  construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether

15  the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.'"

16  *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992) (quoting *Pacific Gas & E. Co. v. G. W. Thomas*

17  *Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968)).  More specifically,

18  
19      The decision whether to admit parol evidence involves a two-step process.  First, the court
      provisionally receives (without actually admitting) all credible evidence concerning the
      parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably
20      susceptible" to the interpretation urged by a party.  If in light of the extrinsic evidence the
      court decides the language is "reasonably susceptible" to the interpretation urged, the
      extrinsic evidence is then admitted to aid in the second step—interpreting the contract.

21  
22  *Winet*, 4 Cal. App. 4th at 1165 (internal citations omitted).  After provisionally reviewing the evidence

23  that would tend to support the existence of an ambiguity in the John Galt–DC3 Assignment, there appear

24  to be two possible ambiguities that the Court must address before determining whether extrinsic evidence

25  will be admitted in aid of interpretation.

26      DC3 and the Phelpses claim that the language John Galt–DC3 Assignment is unambiguous and

ORDER – 18

1   that John Galt and the Kershenbaums should not be allowed to present any extrinsic evidence in aid of the

2   Court's interpretation.  They argue that the John Galt–DC3 Assignment clearly *only* transfers the expired

3   "rights" embodied in John Galt–Judah Production Agreement.  The extrinsic evidence offered to prove

4   that the John Galt–DC3 Assignment could have transferred more—*i.e.*, that an extension or replacement

5   contract existed—consists of Ms. Kershenbaum's deposition testimony that there was another (second)

6   agreement, along with an example of what this agreement looked like (the DC3–Judah Recording and

7   Production Agreement executed on July 8, 2003).  Further, Ms. Kershenbaum's Declaration in opposition

8   to the instant motion names June 20, 2002 as the date that the alleged second agreement between John

9   Galt and Mr. Judah was signed.  Ms. Kershenbaum also discusses the "suspension" of the second

10  agreement (discussed *supra* subsection I.B.2), which would have extended its life long enough that it

11  would have remained in place through the time of the John Galt–DC3 Assignment.  Thus, taking this

12  evidence in the light most favorable to John Galt and the Kershenbaums, the Court must determine

13  whether the proffered evidence renders the language of the John Galt–DC3 Assignment "reasonably

14  susceptible" of the interpretation that John Galt and the Kershenbaums ultimately want—that they can

15  sue DC3 and the Phelpses for breach of the John Galt–DC3 Assignment because that agreement (a

16  contract, not an assignment) was effective and valid.

17          The first possible ambiguity in the John Galt–DC3 Assignment goes to John Galt's and the

18  Kershenbaums' argument that the John Galt–DC3 Assignment is not an assignment, but rather a contract.

19  There is a difference between the two.  "It is important not to confuse an assignment, which is a present

20  transfer, with a contract, which is a promise of future performance."  E. ALLAN FARNSWORTH,

21  CONTRACTS 710 (3d ed. 1999).  Similarly, "whether a *transferee* has given *value* is not the same question

22  as whether a *promisee* has given *consideration*."  *Id.* at 726.

23  //

24  //

25  //

26  ORDER – 19

Regarding the first possible ambiguity, the John Galt–DC3 Assignment contains the following language:

> John Galt Entertainment, Inc. *hereby transfers* all rights of it's [sic] Production Agreement dated May 1, 2002 for the recording Artist Brian Judah to DC3/Entertainment/Sonic Temple Records.
>
> [and]
>
> *[U]pon the signatures of DC3 Entertainment LLC, and Brian Judah's signature on what is known as the Recording and Production Agreement*, John Galt Entertainment Inc[.] *assigns and transfers* all of it's [sic] rights that it received in the production agreement dated May 1, 2002, to the Corporation currently known as DC3 Entertainment LLC.

(John Galt–DC3 Assignment 1 (emphasis added).)  The agreement also later refers to "this transfer," in exchange for which the producer advance, cost reimbursements, and royalties to be paid to John Galt were the sole value (in the case of an assignment) or consideration (in the case of a contract) proffered by DC3.

Despite the consistent use of words of transfer with respect to another contract (the May 1, 2002 John Galt–Judah Production Agreement) and the consistent naming of the John Galt–DC3 Assignment as an "assignment" in all pleadings and admissions prepared by counsel up until the filing of their opposition to the instant motion, John Galt and the Kershenbaums now insist that the legal effect of the John Galt–DC3 Assignment was not to transfer any contract rights, but rather to "terminate John Galt's association with Brian Judah" as consideration for the producer advance, cost reimbursements, and royalties to be paid to John Galt.  (Defs.' Opp'n, Kershenbaum Decl. 2.)  John Galt and the Kershenbaums argue that this transaction was really a contract and that "no assignment was contemplated."  (Defs.' Opp'n 8.)

The first bit of proffered evidence going to the assignment-vs.-contract question is that the DC3–Judah Recording and Production Agreement was executed on July 8, 2003, just before, just after, or simultaneous to execution of the John Galt–DC3 Assignment, which also occurred on July 8, 2003. The Kershenbaums and John Galt argue that because DC3 and Mr. Judah executed their own agreement, there was obviously no need for an "assignment" to give DC3 rights with regard to Mr. Judah, and

ORDER – 20

1  therefore the John Galt–DC3 Assignment must be a "contract."

2  However, the Court does not find the close proximity (or even simultaneous execution) of the

3  two agreements persuasive.  If executed *after* the John Galt–DC3 Assignment, the DC3–Judah Recording

4  and Production Agreement could have immediately replaced assigned rights; and if executed *before*, the

5  John Galt–DC3 Assignment still could have operated to assign rights John Galt had in Mr. Judah and

6  thereby ensure that John Galt would not attempt to bind Mr. Judah to the assigned contract.  The John

7  Galt–Judah Production Agreement and the DC3–Judah Recording and Production Agreement were

8  between different parties.  There is no legal prohibition on an assignment of John Galt's rights in Mr.

9  Judah to DC3 occurring before or after the DC3–Judah Recording and Production Agreement was

10  executed.  Thus, the mere existence of the DC3–Judah Recording and Production Agreement and its date

11  of execution do not render the words "transfer" or "assign" in the John Galt–DC3 Assignment

12  "reasonably susceptible" of the meaning (contract, not assignment) that the Kershenbaums and John Galt

13  advocate.

14  As a second bit of evidence, the Kershenbaums and John Galt suggest that because the royalty

15  and fee arrangements differed between the John Galt–Judah Production Agreement and the John

16  Galt–DC3 Assignment, the John Galt–DC3 Assignment must have been a new contract and could not

17  have been an assignment.  However, these different terms for royalties and fees are just as viably "value"

18  given for an assignment as they are "consideration" for a promise.  John Galt's and the Kershenbaums'

19  argument on this point has no merit, and the Court cannot find an ambiguity on this basis either.

20  Further extrinsic evidence on whether a contract or assignment was intended by the parties

21  includes conflicting testimony by the Kershenbaums and John Galt—sometimes they speak of transferring

22  and assigning rights in the May 1, 2002 contract (and another contract); but at other times, such as in

23  opposition to the instant motion, they declare that there was no assignment of any contract.  The Phelpses

24  and DC3 maintain that there was at least a purported assignment, if not an effective assignment.  Viewing

25  this proffered evidence to determine whether it can render the words "transfer" and "assign"—terms of

26  ORDER – 21

art used both in the John Galt–DC3 Assignment itself and in John Galt's and the Kershenbaums'

attorney-prepared pleadings throughout this case—"reasonably susceptible" of instead meaning that John

Galt's rights were terminated as contract consideration, the Court finds that it cannot.  Accordingly, the

words "transfer" and "assign" are *unambiguous* when taken in the context of the agreement as a whole,

because they specifically refer to another contract that presumably conferred transferrable rights on John

Galt (the May 1, 2002 John Galt–Judah Production Agreement).  The Court finds that a *transfer* of

contract rights, not a termination of contract rights, was intended by the parties.

Having established that the transaction was intended to be a transfer, there may be a related

ambiguity as to *when* the transfer took place—or, in other words, whether John Galt intended a *present

transfer of rights* (an assignment) or a *promise to transfer rights in the future* (a contract).  In the first

passage quoted above, the John Galt–DC3 Assignment says that John Galt "hereby transfers"; whereas in

the second passage quoted above, the transfer appears to be contingent on DC3 and Mr. Judah executing

the DC3–Judah Recording and Production Agreement.  It is unclear from the face of the John Galt–DC3

Assignment whether that event had occurred or not.  If the DC3–Judah Recording and Production

Agreement *had* already been executed, the language in the second passage could be interpreted to mean

that the legal effect was an assignment (consistent with the first passage's words "hereby transfers");

however if that event had not yet occurred, the language in the second passage could be interpreted as a

promise to assign after the DC3–Judah Recording and Production Agreement is executed (inconsistent

with the first passage's words "hereby transfer" and more consistent with the conclusion that this

document is a contract, not an assignment).  Because the factual chronology advocated by all

parties—including John Galt and the Kershenbaums in their opposition to this motion (*see* Defs.' Opp'n 8

(citing Mr. Phelps))—is that the DC3–Judah Recording and Production Agreement was executed *before*

the John Galt–DC3 Assignment, the Court finds that any ambiguity must be resolved in favor of the John

Galt–DC3 Assignment being an "assignment" rather than a contract.  Further, this interpretation renders

the John Galt–DC3 Assignment internally consistent and gives the same meaning (present transfer) to

ORDER – 22

1   both the first and second passages quoted above.

2         Thus, as to the first possible ambiguity, the Court finds that, as a matter of law, the John

3   Galt–DC3 Assignment was an assignment or a purported assignment; it was not a contract or an

4   attempted contract.

5         Having determined the *character* of the agreement, the Court now moves on to interpret its

6   *terms*.  This inquiry must include an analysis of the second possible ambiguity.  As before, the following

7   two passages are critical:

8         John Galt Entertainment, Inc. hereby *transfers all rights of it's [sic] Production*
          *Agreement dated May 1, 2002 for the recording Artist Brian Judah* to
9         DC3/Entertainment/Sonic Temple Records.

10        [and]

11        [U]pon the signatures of DC3 Entertainment LLC, and Brian Judah's signature on what is
          known as the Recording and Production Agreement, John Galt Entertainment Inc[.]
12        *assigns and transfers all of it's [sic] rights that it received in the production agreement*
          *dated May 1, 2002*, to the Corporation currently known as DC3 Entertainment LLC.

13  (John Galt–DC3 Assignment 1 (emphasis added).)  As discussed *supra* subsection I.B.1, the John

14  Galt–Judah Production Agreement ("the agreement dated May 1, 2002" named in the quoted passages)

15  was expired by the time the John Galt–DC3 Assignment was executed in July 2003, but it might have

16  been extended or replaced.  If it was extended or replaced, John Galt *would* have had contract rights to

17  assign to DC3 at the time the John Galt–DC3 Assignment was executed.  The question for the Court is

18  whether the language of the John Galt–DC3 Assignment could have transferred such contract rights

19  despite the fact that the John Galt–Judah Production Agreement was expired.

20        In light of the fact that the only agreement *named* in the John Galt–DC3 Assignment is the

21  expired (May 1, 2002) John Galt–Judah Production Agreement, the best argument in favor of John Galt

22  and the Kershenbaums on this possible ambiguity issue is that the contract does not mean what it says,

23  and that when they transferred rights they "received" in the May 1, 2002 John Galt–Judah Production

24  Agreement, they really meant rights that they *received* in that agreement (which had by then expired) but

25  that had been reconstituted in a later (second) agreement.  In other words, when the Court reads the

26  ORDER – 23

1   contract, John Galt and the Kershenbaums urge it to consider the words "rights" "received" to embody

2   more than just the expired John Galt–Judah Production Agreement.

3        This linguistic contortion will not work.  Rather, the Court finds that the language "rights"

4   "received in the production agreement dated May 1, 2002" is not "reasonably susceptible" of meaning

5   those expired rights *plus* similar rights received in a later (second) agreement between John Galt and Mr.

6   Judah.  First, contract "rights" do not exist as disembodied abstractions apart from a contract that created

7   them.  More precisely, in California, "the intention of the parties as expressed in the contract is the source

8   of contractual rights and duties."  *Pacific Gas & E. Co.*, 442 P.2d at 644.  Thus, there *are no* contractual

9   rights and duties without a valid contract.  The only contract named in the John Galt–DC3 Assignment

10  was the May 1, 2002 John Galt–Judah Production Agreement, which was expired.  Expired contracts no

11  longer in force cannot be the basis of transferrable rights and duties.  Therefore, any attempt to transfer

12  such expired "rights" or duties must fail as a matter of law.

13       Furthermore, "[a]n assignment should describe the subject matter with sufficient particularity to

14  identify the rights assigned, and an assignment will not be construed to assign rights in addition to those

15  expressly described."  7 CAL. JUR. 3D *Assignments* § 35 (2003); *see also Mission Valley East, Inc. v.*

16  *County of Kern*, 120 Cal. App. 3d 89, 97 (1981) ("[T]he assignment must describe the subject matter of

17  the assignment with sufficient particularity to identify the rights assigned.").  This basic tenet of California

18  contract law dictates that when a particular right or set of rights *is* defined in an assignment, additional

19  rights *not* similarly defined or named cannot be considered part of the rights transferred.

20       Assuming without deciding that the second (June 20, 2002) John Galt–Judah agreement existed,

21  *it alone* was the source of any existing transferrable rights.  Not only had the John Galt–Judah Production

22  Agreement expired, but even if it had not expired by its own terms, the alleged second

23  contract contained a merger clause[7] that would have extinguished the May 1, 2002 contract on June 20,

24

---

25       [7]  The contract that the Kershenbaums and John Galt claim is identical to their second contract
    with Mr. Judah (except for the parties and consideration) contains the following language: "This
26  ORDER – 24

2002—less than two months after the first contract was executed and long before its internal expiration date of March 15, 2003. The Court therefore finds John Galt's and the Kershenbaums' characterization of the alleged second agreement as a "supplement" to or "extension" of the John Galt–Judah Production Agreement untenable.  If the second contract existed, it supersedes the first.  Yet, this second contract was *not* named as being transferred.

Could the "rights" of the second contract have been transferred in the John Galt–DC3 Assignment?  The answer must be no.  The only way that the Kershenbaums and John Galt could possibly succeed on their theory that John Galt transferred more than the expired rights is if "rights" at least had been defined by *substance*—instead of by an enabling contract—in the John Galt–DC3 Assignment. While contract "rights" do not exist outside contracts, the Court acknowledges that the first and alleged second John Galt–Judah contracts arose out of a similar transaction[8] and did give similar rights to John Galt—such as the right to "shop" for a distribution agreement in connection with the production of Mr. Judah's first album.  Nevertheless, Ms. Kershenbaum—the drafter[9] of the John Galt–DC3 Assignment—chose to use language that was not so broad.  "Rights to shop for a distribution agreement" could have been used instead of "rights of the May 1, 2002 agreement."  If different language had been used to identify transferred rights, there might have been an ambiguity to resolve.  But Ms.

---

Agreement *contains the entire Understanding of the parties hereto relating to the subject matter hereof* and cannot be changed or terminated except by an instrument signed by the party to be bound." (DC3–Judah Recording and Production Agreement 22 (emphasis added).)

[8] "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."  CAL. CIV. CODE § 1642 (West 2006).

[9] "In cases of uncertainty not removed by the [rules of interpretation], the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  CAL. CIV. CODE § 1654 (West 2006).  While not the sole legal basis for the Court's findings on this point, interpretation *contra proferentem* seems somewhat appropriate here, where Ms. Kershenbaum is the drafter of the problematic language and also is the party claiming that the second (June 20, 2002) contract existed—and thus could have been cited—at the time the John Galt–DC3 Assignment was written and executed on July 8, 2003.  Simply put, Ms. Kershenbaum "had the possibility of drafting the language so as to avoid the dispute."  FARNSWORTH, *supra*, at 473.

ORDER – 25

1   Kershenbaum's use of a *particular* contract to define John Galt's rights is determinative.

2      Finally, incorporation by reference requires at least some level of specificity—"the reference must

3   be clear and unequivocal and called to the attention of and consented to by both parties, and the terms of

4   the incorporated document must be known or easily available to the parties."  14 CAL. JUR. 3D pt. 1

5   *Contracts* § 192 (2005).  Thus, without any language that could reasonably be interpreted as leading to

6   the second contract, John Galt is bound by the limited language it did use.

7      The John Galt–DC3 Assignment was ineffective to transfer any "rights" other than the expired

8   ones, and the John Galt–DC3 Assignment cannot be interpreted to include rights embodied in the alleged

9   second contract between John Galt and Mr. Judah.  The Court therefore finds that no extrinsic evidence

10  may be admitted to interpret the words *"rights of it's* [sic] *Production Agreement dated May 1, 2002"* or

11  "rights" "received in the production agreement dated May 1, 2002," because this language

12  unambiguously refers only to the rights of the expired (or superseded) May 1, 2002 John Galt–Judah

13  Production Agreement.  Thus, the John Galt–DC3 Assignment was ineffective to transfer any "rights"

14  from John Galt to DC3.[10]

**C.  An Analogous Implied-in-Fact Contract?**

16     Having determined that the John Galt–DC3 Assignment was an *ineffective assignment*, the next

17  issue is whether there is any alternative contractual or assignment-based relationship between John Galt

18  and DC3 regarding the terms or purported terms of the John Galt–DC3 Assignment.  Despite the

19  ineffectiveness of John Galt's transfer of "rights," DC3 paid the $30,000 cost reimbursement and $50,000

20  of the $100,000 producer advance to John Galt, as discussed *supra* section I.C.  This partial performance

21  by DC3 of its obligations to give value in exchange for the purported assignment of John Galt's rights in

22  _____

23     [10]  Even if the Court had not found *supra* that the John Galt–DC3 Assignment must be
    characterized as an assignment and not a contract, John Galt's and the Kershenbaums' argument that it

24  was a contract would be mooted by this subsequent finding that the purported transfer was ineffective.
    Had the John Galt–DC3 Assignment been an attempted contract, it would have failed for lack of

25  consideration, because John Galt could not contract for termination of its no-longer-existing rights in the
    John Galt–Judah Production Agreement.

26  ORDER – 26

the John Galt–Judah Production Agreement leaves the question of how such performance should be treated.  Among other relief requests, DC3 and the Phelpses seek return of the $80,000 paid to John Galt under the John Galt–DC3 Assignment.  John Galt and the Kershenbaums, on the other hand, seek the remaining $50,000 producer advance and all royalty payments, as well as damages resulting from Mr. Kershenbaum no longer producing Mr. Judah's album.  Because the instant motion was brought to foreclose any contract claims by John Galt and the Kershenbaums, the Court must determine whether any such claims remain for them to pursue.

Under California law, an implied-in-fact contract is possible where there is no enforceable writing, but the parties' performance indicates mutual assent and contract formation.  *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (applying California law).  "An implied contract is one, the existence and terms of which are manifested by conduct."  CAL. CIV. CODE § 1621 (West 2006).  The difference between an implied and express contract "relates only to the *manifestation of assent*; both types are based upon the expressed or apparent intention of the parties."  1 WITKIN, SUMMARY OF CALIFORNIA LAW, CONTRACTS § 102 (10th ed. 2005).  In the words of the California Court of Appeal,

> An implied contract "'. . . in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being the mere mode of proof by which they are to be respectively established.'"  It is thus an actual agreement between the parties, "the existence and terms of which are manifested by conduct."  Although an implied in fact contract may be inferred from the "conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an intent to promise."

*Friedman v. Friedman*, 20 Cal. App. 4th 876, 887 (1993) (quoting *Silva v. Providence Hosp. of Oakland*, 97 P.2d 798, 803–04 (Cal. 1939); CAL. CIV. CODE § 1621; and *Division of Labor Law Enforcement v. Transpacific Transp. Co.*, 69 Cal. App. 3d 268, 275 (1977), respectively).  Thus, performance and circumstantial evidence can be a basis by which a court can determine whether the parties assented to the terms of an unwritten implied-in-fact contract.  *See, e.g.*, *Donahue v. Ziv Television Programs, Inc.*, 245 Cal. App. 2d 593, 605 (1966).  Simply put, "[a] course of conduct can show an implied promise."  *California Emergency Physicians Medical Group v. PacifiCare of Calif.*,

ORDER – 27

1    111 Cal. App. 4th 1127, 1134 (2003).

2         Applying the facts of this case to California law on implied-in-fact contracts, the Court finds that

3    the conduct of the parties and their deposition testimony shows that *if* the second (June 20, 2002) John

4    Galt–Judah contract existed, the parties would have intended that it be assigned to DC3 in exchange for

5    cost reimbursements in the amount of $30,000, a producer advance in the amount of $100,000, and

6    royalty payments in the amounts specified in the ineffective John Galt–DC3 Assignment.  In making this

7    finding, the Court relies on the circumstances, which include the ineffective John Galt–DC3 Assignment's

8    terms and the conduct of the parties thereafter—all tending to show mutual intent to make promises.

9         Specifically, it is undisputed that Mr. Kershenbaum acted as producer on the Judah album for over

10   a year—a role contemplated by both the DC3–Judah Recording and Production Agreement and the failed

11   John Galt–DC3 Assignment and taken on with the consent of all parties.  Further, DC3 partially

12   performed under the John Galt–DC3 Assignment, manifesting its assent to an assignment of any rights

13   that John Galt had in producing Mr. Judah.  In return, John Galt acted as if it had assigned any and all

14   contract rights it had in producing Mr. Judah to DC3.  John Galt did not attempt to bind Mr. Judah to the

15   purported June 20, 2002 agreement and the Kershenbaums acted in accord with the terms of Mr. Judah's

16   contract with DC3.  These factual conclusions about John Galt's intent are undisputed and supported by

17   the record.  (*See, e.g.*, Pl.'s Mot., Lay Decl. Ex. 3 (Dep. of Ms. Kershenbaum) 41:8–48:5 (*e.g.*, "[A]ny

18   agreement we had with Brian Judah, every single thing was assigned.  We had no more rights, except the

19   rights that were clarified on this piece of paper on the assignment." 48:1–4).)  Similarly, Mr. Phelps

20   understood that he was receiving—or purchasing—all of John Galt's rights.  (Pl.'s Mot., Lay Decl. Ex.

21   13 (Phelps Decl. (filed in support of Pl.'s Mot. to Amend) 2).)  Thus, the Court finds that John Galt and

22   the Kershenbaums assigned or transferred any rights that they retained after the ineffective John

23   Galt–DC3 Assignment was executed by their subsequent behavior and the legal positions they have taken

24   in this litigation.

25        Moreover, though John Galt has not taken such a position, they are hereby estopped from

26   ORDER – 28

1   claiming now or at trial that they retain any rights arising out of the alleged second (June 20, 2002)

2   contract with Mr. Judah.  The doctrine of judicial estoppel

3           precludes a party from gaining an advantage by taking one position, and then seeking a
            second advantage by taking an incompatible position.  The doctrine's dual goals are to
4           maintain the integrity of the judicial system and to protect parties from opponents' unfair
            strategies.  Application of the doctrine is discretionary.  The doctrine applies when (1) the
5           same party has taken two positions; (2) the positions were taken in judicial or quasi-
            judicial administrative proceedings; (3) the party was successful in asserting the first
6           position (i.e., the tribunal adopted the position or accepted it as true); (4) the two
            positions are totally inconsistent; and (5) the first position was not taken as a result of
7           ignorance, fraud, or mistake.

8   *In re Marriage of Taschen*, 134 Cal. App. 4th 681, 689–90 (2005) (internal quotation marks and

9   citations omitted).  The Court has found that John Galt intended to assign any rights it had.  Thus, John

10  Galt has been successful in asserting this position in a judicial proceeding.  Therefore it will not be

11  allowed to claim that it has any rights in the alleged second contract.  If that second contract existed, all

12  rights stemming from it were transferred to DC3 as part of an implied-in-fact contract.

13          Having found that an implied-in-fact contract provisionally exists (contingent on the existence of

14  the purported June 20, 2002 contract between John Galt and Mr. Judah), the Court also finds that

15  whether this potential implied-in-law contract is a "contract" or an "assignment" is largely irrelevant for

16  two reasons.  First, the ultimate effect on the parties would be the same either way—the "value" or

17  "consideration" DC3 provides in exchange for a transfer of John Galt's June 20, 2002 contract rights is

18  the same.  Second, there is no greater barrier to an unwritten assignment than to an unwritten contract.

19  "Absent a statute to the contrary, no writing is necessary for an effective assignment," FARNSWORTH,

20  *supra*, at 713, and, in California, "[a]ll contracts may be oral, except such as are specially required by

21  statute to be in writing." CAL. CIV. CODE § 1622 (West 2006).  Thus, whether assignments may be

22  unwritten on these facts or not (and it is assumed that they can be), an implied-in-fact *contract* that

23  contains a transfer of rights *as consideration* certainly may be unwritten—indeed the very nature of

24  implied-in-fact contracts is that they are unwritten in whole or in part.

25  *//*

26  ORDER – 29

Nor is the one-year statute of frauds a barrier to such a contract.  In California, the one-year statute of frauds provides:

> (a) The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent:
>
> (1) An agreement that by its terms is not to be performed within a year from the making thereof.

CAL. CIV. CODE § 1624 (West 2006).  There are no terms in the implied-in-fact contract proposed here that prohibit performance within one year.  Furthermore, even if the implied-in-fact contract discussed here *did* fall within the one-year statute of frauds, the statute of frauds would be inapplicable.  "Where a contract has been *fully performed by one party and nothing remains to be done except the payment of money by the other party*, the statute of frauds is inapplicable."  *Blaustein v. Burton*, 9 Cal. App. 3d 161, 185 (1970) (emphasis added).  The Court has already found that *if* the second (June 20, 2002) John Galt–Judah contract existed, John Galt has fully performed its obligations by transferring that contract to DC3.  Further, because the Court previously found that specific performance is not an available remedy to enforce the sole producer term (*see supra* note 6), all that is left for DC3 to do is to pay money to John Galt.  Therefore, the statute of frauds is no barrier to an implied-in-fact contract on these facts.

Thus, the Court finds that, as a matter of law, the parties entered into an implied-in-law contract on the terms defined above, *but only if* a second agreement between John Galt and Mr. Judah existed, such that John Galt had contract rights to assign in July 2003.

Because the Court has found that the parties may have obligations to each other under an implied-in-fact contract theory, a determination must be made of *whether a second contract existed between John Galt and Mr. Judah*.  This issue of fact will determine whether the parties must perform and whether there *is* an implied-in-fact contract.  It will determine whether John Galt can sue for breach—the ultimate question on this motion for summary judgment.  Therefore, it is material.  Further, the Court cannot, on the record before it, determine whether the alleged second John Galt–Judah contract existed.  The Kershenbaums and John Galt swear that a second contract did exist.  The Phelpses and DC3 swear that it

ORDER – 30

did not.  Mr. Phelps claims that the only contract between John Galt and Mr. Judah he has ever seen is the May 1, 2002 John Galt–Judah Production Agreement.  Viewing the highly disputed evidence in the light most favorable to John Galt and the Kershenbaums, the Court finds that *whether a second agreement between John Galt and Mr. Judah existed* (*i.e.*, the alleged June 20, 2002 contract) is a material issue of fact that must be reserved for trial.  The genuine dispute on this factual issue must be settled by the jury.

If the jury finds that the alleged second contract does *not* exist and never did, then, as a matter of law, there is no enforceable contract with terms analogous to the John Galt–DC3 Assignment, and John Galt and Mr. Kershenbaum cannot seek damages for breach.  Conversely, if the jury finds that the alleged second contract *does* (or did) exist, then there is, as a matter of law, an implied-in-fact contract between DC3 and John Galt with terms analogous to the failed written John Galt–DC3 Assignment.  The only difference between the ineffective John Galt–DC3 Assignment and the actual implied-in-fact contract is the burden that John Galt gave for its benefits.  Under the terms of this implied-in-fact contract, instead of transferring rights defined by the May 1, 2002 John Galt–Judah Production Agreement, John Galt transferred rights defined by the June 20, 2002 John Galt–Judah Recording and Production Agreement.  John Galt has fully performed such a contract, whereas DC3 has only partially performed.

**D.  Enforceability of an Implied-in-Fact Contract**

Because it is possible that there is a valid implied-in-fact contract between John Galt and DC3, the Court must determine what, if any, defenses DC3 may have.  DC3 claims that John Galt's and the Kershenbaums' intentional and negligent misrepresentations lulled them into the John Galt–DC3 Assignment, and they thereby seek rescission of that agreement due to voidability and a recoupment of moneys paid under it.  Because the Court has found that the John Galt–DC3 Assignment was ineffective and unenforceable, DC3's misrepresentation and rescission claims and defenses will be considered as they could apply to the analogous implied-in-fact contract discussed *supra*, the existence of which contract depends on a factual determination by the jury.  Thus, if the jury finds that a second John Galt–Judah

ORDER – 31

contract existed, and there is, therefore, a valid implied-in-fact contract between John Galt and DC3, the following findings will govern DC3's claims and defenses (as they were presented in the instant motion) related thereto.

California law on voidability due to misrepresentation applies principles of fraud to the misrepresentation analysis:

> Fraud in the inducement . . . occurs when "the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable.* In order to escape from its obligations the aggrieved party must [seek rescission.]"

*Rosenthal v. Great Western Fin. Sec. Corp.*, 926 P.2d 1061, 1073 (Cal. 1996) (quoting *Ford v. Shearson Lehman American Express, Inc.*, 180 Cal. App. 3d 1011, 1028 (1986)). In addition to seeking rescission, the "aggrieved party" may also "defend a suit on the contract by objecting to its enforcement because procured or induced by fraud." *Filet Menu, Inc. v. C.C.L.&G. Inc.*, 79 Cal. App. 4th 852, 861 (2000).

There are five elements of fraud: (1) a false representation or concealment of a material fact; (2) made with knowledge of falsity; (3) with the intent to induce action by another party; (4) where that other party does act in justifiable reliance; (5) and resulting in damage. 1 WITKIN, *supra*, § 286; *see also Hinesley v. Oakshade Town Center*, 37 Cal. Rptr. 3d 364 (2005) (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)).

There are two possible outcomes of the jury's inquiry into whether there was a second (June 20, 2002) contract between John Galt and Mr. Judah. If there was *not* a second contract between John Galt and Mr. Judah, then, accordingly, there can be no implied-in-fact contract. It follows that, as a matter of law, there would be no basis for DC3 to go forward with its claims for misrepresentation, voidability, and rescission, because there would be no contract to rescind.

Further, even if there *was* a second contract between John Galt and Mr. Judah (and thus also an implied-in-fact contract where John Galt would have transferred its rights in the June 20, 2002 contract with Mr. Judah in exchange for the producer advance, cost reimbursements, and royalties that DC3 agreed to pay), DC3's and the Phelpses' claims and defenses for voidability due to misrepresentation and

ORDER – 32

1    rescission must fail as a matter of law.  The "falsity" alleged is about whether there were existing

2    transferrable rights pursuant to *a* contract between Mr. Judah and John Galt.  If the jury finds that there

3    was such a contract, there is no falsity as to John Galt owning transferrable rights.

4          Moreover, even if DC3 and the Phelpses more technically describe the "falsity" involved, not as

5    the existence of transferrable rights, but rather as the identity and precise terms of the specific contract

6    transferred, they still fail on the "materiality" element of their misrepresentation claim.  As long as *a*

7    contract existed that gave John Galt the type of transferrable rights DC3 thought it had, the identification

8    of the contract is immaterial.  It is clear from the record that the June 20, 2002 contract is what DC3

9    thought it was purchasing.  The record also clearly shows that knowledge of the June 20, 2002 contract's

10   specific terms (as opposed to knowledge of the May 1, 2002 John Galt–Judah Production Agreement's

11   specific terms) could not have made DC3 act any differently.

12         First, the alleged second contract, if it existed, gave John Galt exactly the contract rights that it

13   claimed to have (to produce Mr. Judah's album and "shop" for a distribution agreement).  Those were the

14   same basic rights that arose from the expired (or superseded) May 1, 2002 John Galt–Judah Production

15   Agreement, which *had* been identified.  The only difference is that the unidentified contract was

16   enforceable and transferrable when it was transferred.  Therefore, any "misrepresentation" (*i.e.*, failing to

17   disclose the exact terms) of the contract that gave rise to John Galt's rights is immaterial.

18         Second, the record shows that even if Mr. Phelps had been handed a copy of the alleged second

19   John Galt–Judah contract, he likely would not have read it.  For instance, Mr. Phelps admits that he never

20   read—or even saw—the May 1, 2002 John Galt–Judah Production Agreement (which *was* named and

21   incorporated into in the ineffective John Galt–DC3 Assignment) until this litigation began in November

22   2004.  (Pl.'s Mot., Lay Decl. Ex. 13 (Phelps Decl. (filed in support of Pl.'s Mot. to Amend) 2).)  Further,

23   Mr. Phelps testified that sometimes he signs agreements on behalf of DC3 that he does not read, because

24   he relies on others.  (Pl.'s Mot., Lay Decl. Ex. 10 (Dep. of Mr. Phelps) 20:15–19 (regarding the John

25   Galt–DC3 Assignment).)  Mr. Kershenbaum testified that Mr. Phelps may not have even read the

26   ORDER – 33

*DC3*–Judah Recording and Production Agreement.  (Pl.'s Mot., Lay Decl. Ex. 6 (Dep. of Mr. Kershenbaum) 221:22–222:6.)  The Phelpses and DC3 justify this failure to read agreements on the basis of the "close relationship" between the parties.  (Pl.'s Reply 10.)  Without making a finding on the validity of that argument, the Court finds that because Mr. Phelps did not read the first contract between John Galt and Mr. Judah, it is doubtful that he would have read the alleged second one either, given the opportunity.  Therefore, if the second contract between John Galt and Mr. Judah existed, the implied-in-fact contract that transferred it to DC3 cannot be attacked on the basis of misrepresentation, because there was no misrepresentation of a *material fact*.

The Court finds that, as a matter of law, DC3 cannot prove either falsity or materiality (both required to establish just the first element of the misrepresentation claim).   If the jury finds that a second agreement between John Galt and Mr. Judah existed, there is, as a matter of law, an implied-in-fact contract between John Galt and DC3, as discussed *supra*.  In that event, DC3 is foreclosed from advancing a misrepresentation and voidability theory as a defense to an implied-in-fact contract or as a basis to rescind such a contract.  If the jury finds that there was not a second agreement between John Galt and Mr. Judah, then there cannot be an enforceable implied-in-fact contract between John Galt and DC3 regarding transfer of John Galt's rights to produce Mr. Judah.  Accordingly, John Galt and Mr. Kershenbaum would have no basis for a claim of breach.  However, the Court expresses no opinion on the merits of any remedies that DC3 might have in that event, because that issue is not before the Court on this motion for summary judgment.

//

//

//

//

//

//

ORDER – 34

**E.  Accounting and Constructive Trust Counterclaims and Third-Party Claims**

Because the Court has found that it is possible for John Galt (and Mr. Kershenbaum) to make out a claim for breach of an implied-in-fact contract with DC3 if the jury makes the requisite factual finding, DC3's and the Phelpses' request for summary dismissal of John Galt's and Mr. Kershenbaum's counterclaims and third-party claims for accounting of royalties and establishment of a constructive trust must be denied, because these are not, as a matter of law, remedies unavailable to John Galt and Mr. Kershenbaum for DC3's alleged breach.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

ORDER – 35

# V.    CONCLUSION

For the reasons set forth in this Order, Plaintiff's and Third-Party Defendants' motion is hereby GRANTED IN PART and DENIED IN PART, as follows:

(1) DC3's motion to dismiss for lack of standing John Galt's and the Kershenbaums' First Counterclaim for Breach of Contract as to Defendant Timmi DeRosa Kershenbaum is hereby GRANTED for the reasons set forth in section IV.A of this Order.  The First Counterclaim for Breach of Contract is hereby DISMISSED with prejudice as to Defendant Timmi DeRosa Kershenbaum for lack of standing.

(2) DC3's motion to dismiss John Galt's and the Kershenbaums' First Counterclaim for Breach of Contract as to John Galt and David Kershenbaum is GRANTED IN PART and DENIED IN PART. Specifically:

(a) as to the ineffective John Galt–DC3 Assignment, the motion is GRANTED for the reasons set forth in section IV.B of this Order; and

(b) as to a potential implied-in-fact contract between John Galt and DC3, the motion is DENIED for the reasons set forth in sections IV.C and IV.D of this Order.

(3) DC3's and the Phelpses' motions to dismiss John Galt's and Mr. Kershenbaum's Second Counterclaim for an Accounting, Third Counterclaim for Establishment of a Constructive Trust, First Cause of Action for an Accounting and Second Cause of Action for Establishment of a Constructive Trust are all DENIED.

SO ORDERED this 26th day of January, 2006

John C. Coughenour

United States District Judge

ORDER – 36