1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

DC3 ENTERTAINMENT, LLC, a Washington
limited liability company,

11

       Plaintiff and Counterclaim Defendant,

CASE NO. C04-2374C

12

       v.

ORDER

13

JOHN GALT ENTERTAINMENT, INC., a
California corporation; DAVID

14

KERSHENBAUM and TIMMI DEROSA
KERSHENBAUM, husband and wife and the

15

marital community composed thereof,

16

       Defendants and Counterclaim Plaintiffs.

17

_____

18

JOHN GALT ENTERTAINMENT, INC., a
California corporation; DAVID

19

KERSHENBAUM and TIMMI DEROSA
KERSHENBAUM, husband and wife and the

20

marital community composed thereof,

21

       Third-Party Plaintiffs,

22

       v.

23

JONATHAN PHELPS and ESTHER PHELPS,
husband and wife and the marital community

24

composed thereof,

25

       Third-Party Defendants.

26

ORDER – 1

This matter comes before the Court on Plaintiff's and Third-Party Defendants' (Partial) Motion for Summary Judgment on Defendants' Employment Counterclaims and Third-Party Plaintiff Claims (Dkt. No. 179) ("Pl.'s Mot."), Defendants' and Third-Party Claimants' Opposition (Dkt. No. 227) ("Defs.' Opp'n"), and Plaintiff's and Third-Party Defendants' Reply in support of their motion (Dkt. No. 230) ("Pl.'s Reply"). The Court has considered all of the papers submitted regarding this motion and determined that oral argument is not necessary. The Court hereby GRANTS IN PART and DENIES IN PART the motion and rules as follows.

## I.    BACKGROUND AND FACTS

The Court hereby incorporates by reference the "Background and Facts" (Part I) of its Order (Dkt. No. 252) on Plaintiff's and Third-Party Defendants' Motion for Summary Judgment on Defendants' Contract Counterclaims and Third-Party Plaintiff Claims. The Court adds thereto the following, specific to the instant motion:

At issue on the instant motion are Defendants' employment-related counterclaims and third-party claims, wherein Defendants and Counterclaim Plaintiffs David Kershenbaum and Timmi DeRosa Kershenbaum seek damages against Plaintiff and Counterclaim Defendant DC3 and Third-Party Defendants Jonathan Phelps and Esther Phelps for discrimination, harassment, retaliation, and wrongful termination in violation of public policy.[1]

## A. The Parties' Work Together

In addition to the parties' relationship with regard to producing Brian Judah's first album (which was the focus of this Court's Contracts Order (Dkt. No. 252)), the Kershenbaums and the Phelpses arranged for the Kershenbaums to provide services in connection with the Phelpses' new company DC3.

---

[1] As before, for clarity, the various parties and combinations thereof will be referred to as "DC3," "Mr. Phelps," "Ms. Phelps," "the Phelpses," "John Galt," "Mr. Kershenbaum," "Ms. Kershenbaum," or "the Kershenbaums," rather than by their various designations as Plaintiffs, Defendants, and Counterclaim or Third-Party Plaintiffs and Defendants. (*See* Order (Dkt. No. 252) 4 n.1 [hereinafter "Contracts Order"].)

ORDER – 2

This services agreement (dated sometime in early October 2003—hereinafter "DC3 Co-president Agreement") was entered into about three months after the series of agreements related to Mr. Judah's album (the last of which was entered into on July 8, 2003).[2]  The new services to be provided by the Kershenbaums encompassed much more than working on Mr. Judah's album.  While Mr. Judah was DC3's "first artist" and working on his album was DC3's first recording and production project, the new agreement with the Kershenbaums involved developing DC3 into a successful recording and production business that would sign new artists and take on more projects.  DC3 brought the Kershenbaums on board in large part due to the draw of the Kershenbaums' expertise in the field.  The Kershenbaums were to find, train, and develop artists, musicians, and songwriters and were to secure business opportunities for DC3.  In addition to "developing" the business of DC3, they were to oversee production at the Phelpses' recording studio in Ferndale, California.

The DC3 Co-president Agreement, entered into in Seattle, Washington, was an oral services contract that made the Kershenbaums "co-presidents" of DC3, for which they received the equivalent of an annual combined "salary" of $1 million.  Payments of approximately $83,333 were made monthly to the Kershenbaums' company John Galt.  There was no end date or fixed term to the DC3 Co-president Agreement.  The parties agreed that the relationship could end anytime and that if it did, DC3 would make payments to John Galt.  The nature of these payments is disputed, but the Kershenbaums *and* Mr. Phelps characterize them as a "severance package."  (*See* Pl.'s Mot., Lay Decl. Ex. 3 (Dep. of Ms. Kershenbaum) 121 & "Timmi Letter" at 191; *id.* Ex. 5 (Dep. of Mr. Kershenbaum) 206–208; *id.* Ex. 9 (Dep. of Mr. Phelps) 101:11–102:14.)  The parties' professional relationship indeed ended in September

---

[2]  DC3 and the Phelpses characterize the DC3 Co-president Agreement as a "replacement" of their July 8, 2003 agreement with John Galt that involved transferring John Galt's interests in producing Mr. Judah's album to DC3 in return for payments of royalties, costs reimbursement, and a producer advance for Mr. Kershenbaum's services as producer.  In contrast, the Kershenbaums and John Galt characterize the DC3 Co-president Agreement as an employment agreement that made the Kershenbaums employees of DC3.  (*See* Contracts Order 12.)  The Court need not resolve the parties' dispute as to whether any July 2003 agreement survived the formation of the DC3 Co-president Agreement, because that issue is not raised in the instant motion.

ORDER – 3

1  or October 2004 on Bainbridge Island, Washington—about one year after the DC3 Co-president

2  Agreement's inception.[3]  DC3 made semi-monthly payments pursuant to the DC3 Co-president

3  Agreement covering the period from October 1, 2003 through September 30, 2004.  (*Id.* Ex. 20 (invoices

4  and checks).)

5  **B.  Motion for Summary Judgment on Employment Counterclaims and Third-Party Claims**

6       The specific claims are as follows.  Ms. Kershenbaum alleges Discrimination and Harassment on

7  the basis of Religion and Sex in violation of the California Fair Employment and Housing Act

8  ("CFEHA") by DC3.  (Defs.' Fourth and Fifth Counterclaims (Dkt. No. 18).)  She alleges Harassment on

9  the basis of Religion and Sex in violation of CFEHA by the Phelpses as well.  (Third-Party Pl.'s Third

10  Cause of Action (Dkt. No. 18).)  Mr. Kershenbaum alleges Discrimination and Harassment on the basis

11  of Religion in violation of CFEHA by DC3.  (Defs.' Sixth and Seventh Counterclaims (Dkt. No. 18).)  He

12  alleges Harassment on the basis of Religion in violation of CFEHA by the Phelpses as well.  (Third-Party

13  Pl.'s Fourth Cause of Action (Dkt. No. 18).)  Together, the Kershenbaums allege Retaliation in violation

14  of CFEHA and common law Wrongful Termination in Violation of Public Policy by DC3.  (Defs.' Eighth

15  and Ninth Counterclaims (Dkt. No. 18).)  Finally, the Kershenbaums allege Retaliation in violation of

16  CFEHA by the Phelpses as well.  (Third-Party Pl.'s Fifth Cause of Action (Dkt. No. 18).)  They seek

17  general, special, and punitive damages.

18       DC3 and the Phelpses seek dismissal of all of these claims except the CFEHA harassment

19  claims (Defs.' Fifth and Seventh Counterclaims and Third-Party Pl.'s Third and Fourth Causes of Action)

20  on the basis that the Kershenbaums were independent contractors, not employees, and do not have

21

22       [3]  The Kershenbaums allege that Ms. Kershenbaum was fired because she had "the spirit of

23  Jezebel" in her and acknowledge that Mr. Kershenbaum refused to stay with DC3 unless he continued to receive the equivalent of the $1 million per year that the Kershenbaums had been paid together.  In

24  contrast, the Phelpses and DC3 allege that both of the Kershenbaums resigned after Ms. Kershenbaum was told that she could no longer keep her title of "co-president" because she was not capable of fulfilling

25  that role.  The Court need not decide this particular disputed issue, as it is not raised by the instant motion.

26  ORDER – 4

1  standing to assert discrimination or retaliation claims under CFEHA or claims for Wrongful Termination

2  in Violation of Public Policy.[4]  Further, DC3 and the Phelpses argue that punitive damages are not

3  available to the Kershenbaums in any event.

4      The Kershenbaums oppose a finding that they are independent contractors as a matter of law.

5  Additionally, they assert that they are instead employees as a matter of law, and, at the very least, that

6  there remain disputed issues of fact that must be resolved at trial on the question of their status that

7  cannot be resolved in favor of "independent contractor" status.  The Kershenbaums maintain that punitive

8  damages should be available to them if they succeed on their California law claims.

9  **II.    APPLICABLE STANDARD**

10      Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and

11  provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

13  that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

14  a matter of law."  FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the Court must

15  view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences

16  in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*,

17  84 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient

18  evidence for a reasonable fact-finder to find for the non-moving party.  *Anderson*, 477 U.S. at 248.  The

19  inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

20  whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.  The moving

21  party bears the burden of showing that there is no evidence which supports an element essential to the

22  non-movant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this

23

24      [4]  The original motion also sought dismissal of the CFEHA harassment claims as unavailable to
    independent contractors, but DC3 and the Phelpses later withdrew their motion as to the harassment

25  claims, acknowledging that such claims are available to independent contractors as well as employees.
    (Pl.'s Reply 2.)

26  ORDER – 5

1    burden, the non-moving party then must show that there is in fact a genuine issue for trial. *Anderson*,

2    477 U.S. at 250.

3    **III.    ANALYSIS**

4    **A. Employee vs. Independent Contractor Status**

5         It is undisputed that only "employees" can sue for discrimination and retaliation, but that both

6    "employees" and "independent contractors" can sue for harassment under CFEHA. *See* CAL. GOV'T

7    CODE § 12940(j) (allowing harassment claims by persons "providing services pursuant to a contract").[5]

8    Further, under California law, only "employees" can sue for wrongful termination in violation of public

9    policy; "independent contractors" cannot. *See, e.g., Ali v. L.A. Focus Publication*, 112 Cal. App. 4th

10    1477, 1484 (2003). What is disputed on the instant motion is to which category the Kershenbaums

11    belong. To meet their burden on summary judgment, DC3 and the Phelpses must show that the

12    Kershenbaums were independent contractors as a matter of law. This requires a showing that there is no

13    evidence that supports the Kershenbaums' contention that they were instead employees, and therefore

14    that no reasonable jury could find in the Kershenbaums' favor on that issue.

15         For purposes of CFEHA, an "employee" "'does not include an independent contractor as defined

16    in Labor Code section 3353.'" *Lumia v. Roper Pump Co.*, 724 F. Supp. 694, 697 (N.D. Cal. 1989)

17    (quoting CAL. ADMIN. CODE tit. 2, § 7286.5(b)(1)). Labor Code section 3353 defines an "independent

18    contractor" as "any person who renders service for a specified recompense for a specified result, under

19

20        [5] Similar to the definition of an independent contractor discussed *infra*, CFEHA's *harassment* prohibition defines a "person providing services pursuant to a contract" as someone who "meets all of the following criteria":

21

22          (A) The person has the right to control the performance of the contract for services and discretion as to the manner of performance.

23          (B) The person is customarily engaged in an independently established business.

24          (C) The person has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work.

25

26    CAL. GOV'T CODE § 12940(j)(5).
   ORDER – 6

1  the control of his principal as to the result of his work only and not as to the means by which such result

2  is accomplished." CAL. LAB. CODE § 3353. Similarly, for purposes of a common law wrongful

3  termination in violation of public policy claim, the test to determine whether one is an employee or an

4  independent contractor involves a "control" test. *See Ali*, 112 Cal. App. 4th at 1484–85 (applying *S.G.*

5  *Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 403–04 (Cal. 1989)). Thus, the

6  resolution of the Kershenbaums' status as employees or independent contractors will determine whether

7  they may bring their CFEHA discrimination and retaliation claims *and* their California common law

8  wrongful discharge in violation of public policy claims. Accordingly, the Court will proceed under a

9  single analysis as to all the claims that DC3 and the Phelpses seek to have dismissed on the basis of the

10  Kershenbaums' alleged independent contractor status.

11      The employee–independent contractor determination is governed by the evaluation of several

12  secondary factors in addition to application of the "control" tests described *supra*. As set forth by the

13  *Lumia* court:

14          The standard in California for determining if an employee–employer or
       independent contract relationship exists is whether the individual or the employer controls

15      "the manner and means by which the work is to be performed." "If control may be
       exercised only as to the result of the work and not the means by which it is accomplished,

16      an independent contractor relationship is established." Other factors the California courts
       look to when making this decision include: whether or not the one employed is engaged in

17      a distinct occupation; skill required for the occupation; whether the workman supplies the
       instrumentalities, tools and the place of work; the length of time the person is employed;

18      the method of payment, by time or result; whether or not the work is part of the regular
       business of the employer; what is the intent or belief of the parties; and whether the

19      principal is or is not in business. These factors are secondary to the prime consideration of
       who controls the manner and means by which the work is accomplished.

20  *Lumia*, 724 F. Supp. at 696 (quoting *Societa Per Azioni De Navigazione Italia v. City of Los Angeles*,

21  645 P.2d 102, 108 (1982), and citing *Tieberg v. Unemployment Ins. Appointment Bd.*, 471 P.2d 975,

22  979–80 (1970)) (internal citations omitted); *see also Borello*, 769 P.2d at 404. Further, "'[s]trong

23  evidence in support of an employment relationship is the right to discharge at will, without cause.'"

24  *Borello*, 769 P.2d at 404 (quoting *Tieberg*, 471 P.2d at 979).

25  //

26  ORDER – 7

1    "The determination of employee or independent-contractor status is one of fact if dependent upon

2    the resolution of disputed evidence or inferences." *Borello*, 769 P.2d at 403.  In order to grant summary

3    judgment for DC3 and the Phelpses, therefore, the Court must determine that the application of

4    California's employee–independent contractor test must result in a determination that the Kershenbaums

5    were indeed independent contractors, even when all reasonable inferences are resolved in their favor.

6    Moreover, the parties dispute whether there are disputed facts or not, so the Court must determine

7    whether there are any genuine issues of material fact that must be resolved at trial.  The Court finds the

8    following facts relevant.

9            The undisputed facts that tend to show that the Kershenbaums are *independent contractors*

10   include the following.  First, the intent of the Kershenbaums that they be independent contractors is clear.

11   This is evidenced in the record through invoices from John Galt to DC3 billing it "[p]er our agreement for

12   loan out services rendered by David Kershenbaum and Timmi Kershenbaum to DC3." (*See* Pl.'s Mot.,

13   Lay Decl. Ex. 20 (invoices).)   Not only are the words "loan out services" significant, these invoices are

14   also relevant because they were sent at all—invoicing is a practice more consistent with independent

15   contractors than employees.  Further, the invoices were paid by DC3 checks made out to John Galt with

16   the words "Contract Labor" in the memo. (*Id.* Ex. 20; *id.* Ex. 19 (email directing payments to John Galt

17   and explaining that the Kershenbaums' "salaries" were to be paid as "gross wages" to John Galt "which

18   will act as a loanout corporation and account for it's [*sic*] own tax liability")).)  The check memo language

19   goes to show that DC3 may have intended a contractual relationship as well.  However, the

20   Kershenbaums did call their income a "salary" from the beginning and the combination of the "gross

21   wages" and "loanout" language provides a less-than-clear picture of what was actually going on.  Thus,

22   while the invoices and emails about "loanout" services tend to favor independent contractor status, they

23   do not unequivocally do so.  Further, as is clear from *Borello*, labeling someone an "independent

24   contractor"—even self-labeling—is not dispositive.  769 P.2d at 401.

25   //

26   ORDER – 8

Second, the Kershenbaums' requests for health and dental insurance and DC3 "company" credit cards were met with responses that indicated that these benefits are "employee" benefits unavailable to "independent contractors." (*Id.* Ex. 21 (email correspondence between Mr. Kershenbaum and Brad Thompson about insurance); *id.* Ex. 22 (email correspondence between Mr. Kershenbaum and Brad Thompson about credit cards).) Further, the record contains no evidence that the Kershenbaums ever received such benefits. However, the emails about insurance and credit cards indicate that there was some question about the Kershenbaums' true status. Thus, while probative to some degree, these transactions are not strong factors that favor independent contractor status.

Third, the Kershenbaums' request for automatic deposit of their semi-monthly payments was met with a response that DC3 needed "to resolve" whether they were employees. (*Id.* Ex. 23 (email correspondence between Mr. Kershenbaum and Brad Thompson).) This prompted Mr. Kershenbaum to say that for their "tax purposes" they "would like to have John Galt continue to 'provide services' but would love to discuss other 'auto-debit' alternatives." (*Id.*) Based on this transaction, DC3 and the Phelpses argue that the Kershenbaums "specifically declined the opportunity to become employees." (Pl.'s Mot. 9.) They further point out that the Kershenbaums received a salary from John Galt, not DC3, and that the payments from DC3 to John Galt were "treated as income not wages on which payroll taxes or withholdings would be paid." (*Id.* at 10.) John Galt received a 1099 from DC3 for John Galt's tax preparation; the Kershenbaums did not receive W-2 forms. (Pl.'s Mot., Phelps Decl.) While this payment arrangement, done at the Kershenbaums' request, supports the Kershenbaums' independent contractor status, it is not dispositive. As noted in *Ali*, an employer's "failure to withhold income taxes is 'merely the legal consequence of an independent contractor status not a means of proving it.'" 112 Cal. App. 4th at 1486 (internal citation omitted).

Significantly, the above facts in favor of independent contractor status go to just the "secondary factors" of the California test that the Court must apply—these factors are secondary to the primary "control test" that differentiates between control "only as to the result of the work" and control of "the

ORDER – 9

means by which it is accomplished" as well. *See Lumia*, 724 F. Supp. at 696. To reiterate the distinction, if there is control over the "manner and means" of production, there is likely an employee–employer relationship; if there is control only over the "result," there is likely an independent contractor relationship. Whereas DC3 and the Phelpses have pointed to numerous places in the record to support their arguments on the *secondary* factors supporting the Kershenbaums' independent contractor status, they have pointed to little but their own arguments and the Declaration of Harry Phelps in support of this motion to prove that DC3 and the Phelpses had little if any control over the "manner and means" of the Kershenbaums' work. (*See* Pl.'s Mot. 10–11.)

Further, the undisputed facts that tend to show that the Kershenbaums were *employees* are compelling. They include the following. First, the Kershenbaums (through John Galt) were paid semi-monthly as if receiving "paychecks" from an "employer." (*See* Pl.'s Mot., Lay Decl. Ex. 19 (checks for periods from the first through the fifteenth and the fifteenth through the thirtieth days of each month).) The payments were ongoing, not made on a "per-project" basis. DC3's payments were thus regular, consistent, and did not depend on particular milestones in the Kershenbaums' work or completion of particular tasks. This payment structure tends to show that the Kershenbaums were employees.

Second, not only was John Galt paid incrementally for ongoing services by the Kershenbaums, there was no fixed term to the contract under which the Kershenbaums were functioning (the DC3 Co-President Agreement). This indefiniteness favors employee status. Further, it was understood that each party could terminate the relationship at any time, for any reason. This evidence of a "right to discharge at will," *Borello*, 769 P.2d at 404, is "strong evidence" in support of an employment relationship.

Third, though the facts surrounding it are heavily disputed, all parties agree that there was something called a "severance package" that the Kershenbaums were to receive if the Kershenbaums were "terminated." Though this factor is not dispositive, in part because of the disputed facts about its details and intent, its recurrence in the depositions is somewhat favorable to finding an employment relationship.

ORDER – 10

Fourth, DC3 and the Kershenbaums are in the same business—recording and producing music. Thus, the services provided by the Kershenbaums (arguably experts) to DC3 (arguably newcomers to the field) were nevertheless related to the very core of DC3's purpose and area of business—music recording and production. Again, this factor favors finding an employee–employer relationship. Perhaps the Kershenbaums were brought on as consultants, but their function in the daily operations of DC3 suggests that they could have been more than that. For example, the record shows that according to Ms. Phelps, the "management" core of the newly-formed DC3 consisted of the Phelpses and the Kershenbaums.

Again, significantly, the above go to just the "secondary factors" and not to the core issue of whether DC3 and the Phelpses controlled the "manner and means" of the Kershenbaums' work—or merely the result. However, there are facts that tend to support their employee status on this central question as well. The *Lumia* court found exclusivity and the ability to bind the "employer" to be significant. 724 F. Supp. at 697. The Kershenbaums argue that they were bound by an exclusivity term—meaning that they could not "compete" with DC3 through John Galt or otherwise. This assertion is not just supported by their own litigation materials; it also appears to be supported by the record. (*See* Pl.'s Mot., Lay Decl. Ex. 3 ("Timmi Letter") at 193 (referring to "our exclusive commitment" as consideration for the "severance" package).) Further, the record supports the proposition that Ms. Kershenbaum, as part of the "management" team of DC3, did have the power to bind DC3 by negotiating contracts with artists. She was thought to be an expert at such negotiations by the parties.

The Court cannot determine on the record before it whether the Kershenbaums actually were bound to exclusively work for DC3 or whether they were precluded from separate ventures through John Galt; nor can the Court determine on the record before it how much oversight DC3 imposed or retained. While the exclusivity and power-to-bind factors are not dispositive in the Kershenbaums' favor, the Court finds that the questions about them are significant enough to constitute a genuine issue of material fact as to how much control DC3 and the Phelpses had over the Kershenbaums' "manner and means" of performance and, ultimately how much they were like employees rather than independent

ORDER – 11

1   contractors—particularly when added to the various secondary factors discussed *supra* that also favor

2   employee status.

3        The inquiry into control over the "manner and means" leading to the work product "result" is the

4   *standard* in California.  Though significant evidence has been submitted by both sides on the *secondary*

5   *factors*, the Court must find that there remain disputed material issues of fact for trial on the most

6   important factor.  Ultimately, the Court has little more than declarations and arguments from either side

7   that speak directly to this extremely important issue.  Further, the "secondary factors" of the

8   employee–independent contractor analysis are at least as favorable to the Kershenbaums as they are to

9   DC3 and the Phelpses when all reasonable inferences are drawn in the Kershenbaums' favor.

10       The fact that the parties did *not* write down the terms of the DC3 Co-president Agreement leaves

11  the Court to wonder what its specific terms were.  The evidence provided to show what these terms were

12  is not sufficiently clear to resolve the highly disputed employee–independent contractor question.  Taking

13  the disputed evidence in the light most favorable to the nonmoving parties, the Court cannot find as a

14  matter of law that the Kershenbaums were independent contractors.  However, it does not follow that the

15  Court has found that they were instead employees as a matter of law (nor is that issue before the Court).

16  The Court leaves the decision about whether the Kershenbaums were independent contractors or

17  employees to the jury.  Accordingly, DC3's and the Phelpses' motion for summary judgment on this issue

18  must be denied.

19  **B.  Availability of Punitive Damages**

20       Having determined that the jury must decide whether the Kershenbaums were independent

21  contractors or employees, the Court must reach the issue of the availability of punitive damages, because,

22  even if the Kershenbaums are properly characterized as "independent contractors," (and therefore they

23  cannot pursue claims for discrimination, retaliation, or wrongful termination), they nevertheless may

24  proceed with their claims for harassment under CFEHA as independent contractors.  CAL. GOV'T CODE

25

26  ORDER – 12

1   § 12940(j) (allowing harassment claims by persons "providing services pursuant to a contract").[6]

2       State law governs diversity cases.  *See generally*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

3   The Kershenbaums have pled their discrimination, harassment, and retaliation claims under California law

4   (specifically, CFEHA).  Further, because DC3 and the Phelpses have made no meaningful challenge to

5   the applicability of CFEHA (*e.g.*, by alleging that the claims would have been more appropriately brought

6   under a different statutory scheme), they concede that CFEHA applies to the Kershenbaums'

7   discrimination, harassment, and retaliation claims, despite their cursory assertion to the contrary in their

8   rebuttal briefing.  (*See* Pl.'s Reply 8.)  Thus, the Court finds CFEHA applicable to the Kershenbaums'

9   *claims* for discrimination, harassment, and retaliation.  Available damages, however, are a separate

10  matter.

11      What is disputed in the instant motion is whether *all* of CFEHA's *remedies* are available when

12  CFEHA governs the Kershenbaums' claims—California statutory claims that are being litigated in a

13  federal court in Washington.  Specifically, the Kershenbaums seek punitive damages.  DC3 and the

14  Phelpses oppose such damages, arguing that Washington's public policy against punitive damages

15  controls, regardless of the availability of punitive damages in California.  The Court is thus presented with

16  a conflict of laws question.

17      Federal district courts must apply the choice-of-law rules of the state where the federal court sits.

18  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).  Washington courts apply the choice-of-law

19  analysis set out in the *Restatement (Second) of Conflict of Laws.  Fluke Corp. v. Hartford Accident &*

20  *Indem. Co.*, 34 P.3d 809, 815 (Wash. 2001).  Accordingly, Washington courts will not engage in a

21  conflicts analysis unless a true conflict exists.  *Burnside v. Simpson Paper Co.*, 864 P.2d 937, 940–41

22  (Wash. 1994).  The parties all agree that a true conflict exists in this case.  Moreover, the Kershenbaums

23

24  ────────────────

25      [6]  As noted *supra* section III.A, the availability of harassment claims regardless of the Kershenbaums' status as employees or independent contractors is undisputed—DC3 and the Phelpses agree in their Reply that independent contractors may sue for harassment.  (Pl.'s Reply 2.)

26  ORDER – 13

1    seek to have California law applied to the issue of whether punitive damages are available to them, while

2    DC3 and the Phelpses seek to have Washington law applied.  The differences between California and

3    Washington law are pronounced.

4         Punitive damages are an available remedy under CFEHA.  *Commodore Home Systems, Inc. v.*

5    *Superior Court of San Bernardino County*, 649 P.2d 912, 918 (Cal. 1982) ("[I]n a civil action under the

6    FEHA, all relief generally available in noncontractual actions, including punitive damages, may be

7    obtained."); *see also* CAL. CIV. CODE § 3294 (specifically allowing punitive damages in cases of

8    "oppression, fraud, or malice").  Further, it is clear that punitive damages are available under CFEHA for

9    *harassment* claims in particular.  *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833, 842 (1998);

10   *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590, 620–21 (1989).  Accordingly, the

11   availability of punitive damages clearly will be an issue even if the Kershenbaums are found to be

12   independent contractors.

13        In contrast to California's allowance of punitive damages, under the law of Washington, "punitive

14   damages are *not* allowed unless expressly authorized by the legislature."  *Barr v. Interbay Citizens Bank*

15   *of Tampa, Florida*, 635 P.2d 441, 443 (Wash. 1981).  Washington has an "expressed policy" disfavoring

16   punitive damages, "because they give the plaintiff a windfall beyond full compensation."  *Fluke Corp. v.*

17   *Hartford Accident & Indem. Co.*, 7 P.3d 825, 831 (Wash. App. 2000) (citing *Dailey v. North Coast Life*

18   *Ins. Co.*, 919 P.2d 589 (Wash. 1996)), *aff'd*, *Fluke*, 34 P.3d 809.  This approach to punitive damages in

19   Washington dates back to the oft-quoted statement in *Spokane Truck & Dray Co. v. Hoeffer*, 25 P. 1072,

20   1074 (Wash. 1891), concluding that neither the plaintiff nor the public has an interest in the imposition of

21   punitive damages in civil cases.[7]  The Court therefore finds that the threshold issue—whether an actual

22   

23        [7] The *Spokane Truck* court explained:

24             Exclusive of punitive damages, the measure of damages as uniformly adopted by
             the courts and recognized by the law is exceedingly liberal towards the injured
25           party.  There is nothing stinted in the rule of compensation.  The party is fully
             compensated for all the injury done his person or his property, and for all losses

26   ORDER – 14

conflict exists between Washington law and California law—is clearly met in this case.

Where a conflict exists, Washington courts decide which law applies "by determining which jurisdiction has the 'most significant relationship' to a given issue." *Burnside*, 864 P.2d at 940–41. This is the test set forth in the *Restatement (Second) of Conflict of Laws*. *Southwell v. Widing Transp., Inc.*, 676 P.2d 477, 479–80 (Wash. 1984); *Barr*, 635 P.2d at 443. The *Restatement* sets forth the "most significant relationship" standard as follows:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971). The principles of § 6 to be applied include:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,

---

which he may sustain by reason of the injury, in addition to recompense for physical pain, if any has been inflicted. But it does not stop here; it enters the domain of feeling, tenderly inquires into his mental sufferings, and pays him for any anguish of mind that he may have experienced. Indignities received, insults borne, sense of shame or humiliation endured, lacerations of feelings, disfiguration, loss of reputation or social position, loss of honor, impairment of credit, and every actual loss, and some which frequently border on the imaginary, are paid for under the rule of compensatory damages. The plaintiff is made entirely whole. The bond has been paid in full. Surely the public can have no interest in exacting the pound of flesh.

25 P. at 1074.

ORDER – 15

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* § 6.  Application of these sections involves a two-step analysis.  *Southwell*, 676 P.2d at 480.  The first is to evaluate the contacts with each interested jurisdiction "according to their relative importance with respect to the particular issue."  *Id.*  The second step "involves an evaluation of the interests and public policies of potentially concerned jurisdictions," the extent of which "should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and the particular issue involved."  *Id.*  The "ultimate outcome, in any given case, depends upon the underlying facts of that case."  *Id.*  Further, the record before the Court on the instant motion is sufficient to weigh the facts and determine the conflicts issue as a matter of law.  *See id.* at 481.

Before applying this conflicts analysis to the instant case, the Court will address the Kershenbaums' first argument in opposition to the application of Washington law, because in making this argument, the Kershenbaums purport to resolve the conflicts matter without needing to apply the *Restatement* test set forth *supra*.  The Kershenbaums argue that because (1) CFEHA has been found to specifically provide for punitive damages, *see Murillo*, 65 Cal. App. 4th 833; (2) California statutes allow for punitive damages, *see* Cal. Civ. Code § 3294; Cal. Gov't Code § 12965, and make clear that protection of employees is an important public policy, *see* Cal. Gov't Code §§ 12920, 12920.5; and (3) Washington will allow punitive damages when a statute so provides, the answer must be that punitive damages (part of the "full range of damages" under CFEHA) are available in this case.  (Defs.' Opp'n 10–11.)  In other words, because *California* statutes govern the claims and those statutes provide for punitive damages, Washington's requirement of statutory provision is satisfied.  The Court disagrees.

//

//

ORDER – 16

1     Simply because *punitive* damages are available for a CFEHA violation in California, it does not

2  follow that they must be allowed *in Washington* by virtue of their presence as part of California's

3  statutory scheme, even when Washington courts apply California's statutes to determine a violation of

4  rights and ensuing *compensatory* damages.  First, according to the *Restatement*, the "law selected by

5  application of the rule of § 145 determines the measure of damages."  RESTATEMENT (SECOND) OF

6  CONFLICT OF LAWS § 171.  Section 145 also governs the availability of punitive damages—specifically,

7  the "law selected by application of the rule of § 145 determines the right to exemplary damages."  *Id.* §

8  171 cmt. d.  Further, the Reporter's Notes to that comment state that:

9          The *law governing the right to exemplary damages need not necessarily be the same as*
           *the law governing the measure of compensatory damages*. This is because situations may
10         arise where one state has the dominant interest with respect to the issue of compensatory
           damages and another state has the dominant interest with respect to the issue of exemplary
11         damages.

12  *Id.* § 171 (Reporter's Notes to cmt. d) (emphasis added).  Second, not only is the *Restatement* clear that

13  one state's laws might govern compensatory damages, while a different state's laws govern punitive

14  damages, Washington courts have applied this principle as well.  The Supreme Court of Washington has

15  noted that comity is the mechanism by which one state's courts will enforce another state's statutory

16  rights.  *Meand v. Pacific Gamble Robinson Co.*, 153 P.2d 686, 693 (Wash. 1944).  However, another

17  state's statutory rights will *not* be enforced when such enforcement would be contrary to the public policy

18  of the forum.  *Id.*  Nor is this principle unique to Washington.[8]  The Court therefore finds that it *may*

19  apply CFEHA for purposes of determining liability and compensatory damages, but refuse to apply

20  CFEHA on the issue of punitive damages because of Washington's expressed strong public policy in

21  opposition to such damages.

22  //

23

24         [8]  For example, in *Pearson v. Northeast Airlines, Inc.*, 309 F.2d 553 (2d Cir. 1962), although
    New York would apply a Massachusetts wrongful death statute, New York was not required to give full
25  faith and credit to the corresponding Massachusetts damages cap that conflicted with New York's strong
    public policy refusing to cap wrongful death recovery.
26  ORDER – 17

Having determined that California law may apply to part, but not all of the Kershenbaums'
CFEHA claims, the Court must apply Washington's choice-of-law analysis, as set forth *supra*, to
determine whether application of California law on the issue of punitive damages is appropriate on the
facts of this case.  As to the parties' contacts (residence, place of business, conduct, injuries, and
relationship center) as defined by the *Restatement*, the Court finds the following facts relevant.

The Kershenbaums were residents of California during the time at issue in this lawsuit, while the
Phelpses were and still are Washington residents.  The Kershenbaums' company John Galt[9] is a California
entity, while DC3 is a Washington entity.  DC3—the Kershenbaums' alleged employer—has its principal
place of business in Washington.  The alleged employment relationship between DC3 and the
Kershenbaums (pursuant to the DC3 Co-president Agreement) was negotiated in Washington (in Seattle)
and terminated in Washington (on Bainbridge Island).  Further, many of the parties' business transactions
(such as meetings) were centered in Seattle, Washington.  However, the Kershenbaums were required to
do some level of work in California at the Phelpses' recording studio in Ferndale, California.[10]

One major purpose of the parties' business relationship was that the Kershenbaums would
develop DC3's recording business, which was and is located in Washington.  Notably, "development" of
DC3 went much farther than simply recording records.  (*See* Pl.'s Reply 10–11 (quoting the
Kershenbaums' testimony about their roles).)   While the recording aspect did take place largely in
California and was overseen by the Kershenbaums, who lived in California, the "development" aspect of
their relationship presumably was centered in Washington.

//

//

---

[9]  While John Galt is not a party to the CFEHA claims, it is the entity through which the
Kershenbaums were paid for their services under the agreement at issue here.

[10]  DC3's and the Phelpses's strained reminder that DC3 does *not* own the recording studio (Pl.'s
Reply 9) is irrelevant, given that the Phelpses *do* own it, and claims that could result in punitive damages
were pled against both DC3 and the Phelpses.

ORDER – 18

The alleged injuries occurred in both states, though the greatest number and the most significant occurred in or around Seattle, Washington (*e.g.*, being forced to attend Mars Hill Church in Seattle; being forced to pray and be submissive to male employees at business meetings in Seattle). Moreover, two significant incidents that occurred in California took place before the alleged employment relationship arose (*e.g.*, the "exorcism" of Ms. Kershenbaum's hairless Chinese crested dog; being "tortured" on a bus trip).

The Court must view the facts in the light most favorable to the Kershenbaums—the nonmoving parties. In doing so, the Court finds that these facts, when taken together and applied to the analytical structure of the *Restatement*, show that Washington has the *most* significant relationship to the instant dispute. That *some* factors favor California law is not enough to find that California has the most significant relationship to the instant dispute.

Further, as to the choice-of-law "principles" to be considered in making this finding, the Court notes the following. The *Restatement* discusses the policies of the interested states and the forum, as well as the protection of justified expectations. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6. The policy of Washington in eschewing punitive damages is essentially to keep plaintiffs from receiving a windfall after being fully *compensated*. *Fluke*, 7 P.3d 825. The policy of California in allowing punitive damages is to deter and punish, particularly in relation to discriminatory, harassing, or retaliatory conduct that is oppressive, fraudulent, or malicious. CAL. CIV. CODE. § 3294; CAL. GOV'T CODE §§ 12920, 12920.5. Each of these policies must be considered in light of the clear incompatibility of the two. Washington's policy is to *not* do exactly what California's policy does—punish in civil cases. Washington's policy, therefore, is a strong one that must carry significant weight where it has the most significant relationship with the instant dispute. Finally, as to justified expectations, the Court finds here too that the parties would be justified in expecting Washington law to apply in an area where Washington and California policy differed and where their relationship was centered in Washington.

//

ORDER – 19

The Kershenbaums rely heavily on *Kammerer v. Western Gear Corp.*, 635 P.2d 708 (Wash. 1981), in arguing that they, as California residents doing business in California, are entitled to California's legal protections, including available damages.  In *Kammerer*, the Supreme Court of Washington found application of California law on punitive damages appropriate, holding that "a Washington court can award punitive damages under the law of California."  *Id.* at 712.  However, that a Washington court *can* award punitive damages under California law does not mean that it could (or would) do so on the facts of *this* case.

*Kammerer* is distinguishable from the instant case.  There, the plaintiffs were residents of California, as here, but all negotiations of the parties and all fraudulent representations were made in California, royalty payments were to be made in California, and the Washington defendant corporation had a "substantial part" of its business in California.  *Id.* at 711–12.  These *Kammerer–Western Gear* contacts are much more significantly weighted toward California than the Kershenbaum–DC3–Phelps contacts described *supra*.  As a basis for finding that California had a "specific interest to be furthered," the *Kammerer* court noted that "the most significant relationships were in California" and "the conduct and acts as to the fraud and misrepresentation were accomplished in California."  *Id.* at 712.  This Court cannot say the same about the Kershenbaums' business dealings with DC3 and the Phelpses, which were clearly centered in Washington despite some contacts with California.

Furthermore, *Kammerer* is totally distinguishable from the instant case for another reason—the parties in *Kammerer* specifically *chose* California law in their negotiations.  *Id.* at 712.  In the instant case, despite this Court's finding of the applicability of California law as to some of the parties' transactions, the oral DC3 Co-president Agreement at issue here has no "choice of law clause"—and, more importantly, it contains no known term nearly specific enough to imply that the parties agreed that California punitive damages law would apply to any disputes.

While this case is not as unmistakably clear as one where *all* of the "contacts point to Washington as the state with the most significant relationship," *see Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 88

ORDER – 20

1  P.3d 966, 986 (Wash. App. 2004), the Court cannot find that the California contacts that do exist are

2  strong enough to warrant the *Kammerer*-type result that the Kershenbaums advocate.

3       The Court finds that the weight of the *Restatement* factors favors application of Washington law.

4  Therefore, the Kershenbaums may not pursue punitive damages, because Washington's rule that punitive

5  damages are contrary to public policy precludes a CFEHA award of punitive damages in this case.

6  Accordingly, the Kershenbaums' claims for punitive damages must be dismissed as a matter of law.

7  **IV.    CONCLUSION**

8       For the reasons set forth in this Order, Plaintiff's and Third-Party Defendants' motion is hereby

9  GRANTED IN PART and DENIED IN PART, as follows:

10      (1) DC3's and the Phelpses' motion to find the Kershenbaums "independent contractors" as a

11  matter of law and dismiss their discrimination, retaliation, and wrongful termination claims is hereby

12  DENIED for the reasons set forth in section III.A of this Order.

13      (2) DC3's and the Phelpses' motion to dismiss the Kershenbaums' claims for punitive damages is

14  hereby GRANTED for the reasons set forth in section III.B of this Order.  All claims for punitive

15  damages requested in conjunction with the Kershenbaums' joint and individual claims for discrimination,

16  retaliation, harassment, and wrongful termination in violation of public policy are hereby DISMISSED

17  with prejudice.  If the Kershenbaums, jointly or individually, can prove liability as to discrimination,

18  retaliation, harassment, or wrongful termination in violation of public policy, punitive damages will not be

19  an available remedy.

20      SO ORDERED this 2nd day of February, 2006.

21

22

23                                              John C. Coughenour

24                                              United States District Judge

25

26  ORDER – 21